JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
JENNY L. FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: dkaelin@murraylaw.com
Email: jlfountain@murraylaw.com

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>COMUNITY LENDING, INCORPORATED, A CALIFORNIA CORPORATION, ET AL.<br><br>Debtor.<br><br>5671 Santa Teresa Blvd, Suite 201<br>San Jose, CA 95123<br><br>Employer's Tax ID No.: 94-2673933 | Case No. 08-50030-MM-11<br><br>Chapter 11<br><br>Jointly Administered Chapter 11 Cases |
| In re:<br><br>LES LIQUIDATION, INC., A CALIFORNIA CORPORATION, fka LENDER E-SOURCE INC.<br><br>Debtor.<br><br>5671 Santa Teresa Blvd, Suite 201<br>San Jose, CA 95123<br><br>Employer's Tax ID No.: 33-0966517 | Case No. 08-50031-MM-11<br><br>Date: July 10, 2008<br>Time: 11:30 a.m.<br>Place: U.S. Bankruptcy Court<br>280 S. First St., Room 3070<br>San Jose, CA 95113<br>Judge: Honorable Marilyn Morgan |

/ / /

/ / /

/ / /

# DEBTORS' CHAPTER 11 STATUS CONFERENCE STATEMENT

**TO: THE HONORABLE MARILYN MORGAN, UNITED STATES BANKRUPTCY JUDGE:**

ComUnity Lending, Inc. ("CLI" or the "Debtor") and LES Liquidation, Inc. ("LES" and collectively with CLI, the "Debtors"), the debtors and debtors in possession herein, hereby submit this statement to report on the Debtors' liquidation efforts, significant events since the last Chapter 11 Status Conference and to address anticipated events over the next ninety days.

## I. PRELIMINARY MATTERS

1. The within cases were commenced on January 4, 2008 (the "Petition Date").

2. The previous Chapter 11 Status Conference (the "First Status Conference") was held on March 12, 2008.

3. No creditors' committee has been appointed in either case.

4. As previously reported to the Court, prior to the commencement of its case, CLI was historically in the business of originating, brokering, servicing and selling residential mortgages. LES is the wholly-owned subsidiary of CLI which was not operating as of the Petition Date. Prior to the Petition Date, CLI had ceased all loan origination business and limited its operations to the sale of its remaining loans and real estate owned ("REO") properties, completing foreclosures and liquidating certain other assets.

5. The Debtors are managed by Diablo Management Group ("DMG") and Richard G. Couch, the Court-appointed Responsible Person in these cases. Certain former employees of CLI are also providing services as independent contractors.

6. Under DMG's management, since October 25, 2007 approximately $6 million in cash has been generated. Pre-petition gross proceeds were over $4 million, with net proceeds to CLI of approximately $2 million after payoff of collateral-backed advances and associated costs. Post-petition liquidation efforts to date are addressed below.

7. There are no cash collateral issues in these cases. The claims asserted by certain warehouse lenders, which were secured by loans, were all satisfied prior to the Petition Date.

8. Following a hearing on April 11, 2008, the Court extended the exclusive period during which only the Debtors may file a plan through and including July 7, 2008 (the "Exclusivity

Order"). The Debtors have filed concurrently with this statement their proposed plan of liquidation as discussed further below. The plan is a joint plan wherein the Debtors propose the substantive consolidation of their bankruptcy estates.

9. The Debtors are current on their monthly operating reports and quarterly fees to the Office of the United States Trustee. To the best of their knowledge, the Debtors are also current on all post-petition taxes.

## II. REPORT ON LIQUIDATION EFFORTS

10. <u>Cash on Hand</u>. As of July 2, 2008, the unrestricted cash on hand of the Debtors totals $2,173,592.72. These funds are held in an authorized debtor-in-possession bank account.

11. <u>Sales Outside the Ordinary Course</u>. Following a hearing on April 11, 2008, the Court authorized the Debtor to sell certain assets outside the ordinary course of business (vehicles, artwork, and office equipment). The Court authorized the Debtor to sell these personal property assets via an auction which has since been completed. The auction resulted in overall sale proceeds in excess of the established minimums: the established minimum prices totaled $41,345 and the auction yielded total sale proceeds of $51,050. After payment of the auctioneer's approved 15% commission, the Debtor will receive $43,392.50. The Debtor anticipates that the sale of its remaining office furniture and equipment will occur at a later date when such items are no longer needed.

12. <u>Sales in the Ordinary Course</u>. As described in the Debtors' First Status Conference statement, CLI has continued the liquidation of certain assets within the ordinary course of its business. A description of these assets and recoveries to-date is described below.

    a. <u>REO Properties</u>. CLI has completed the sale of most of the REO properties in its portfolio. As of July 1, 2008, the company had sold nine REO properties for a net to the bankruptcy estate of $1,079,470. Two of the four remaining REO properties are presently in escrow and are expected to close in July 2008 with gross sales of $205,300. The other two REO properties have a combined listing value of $91,900.

    b. <u>Loans</u>. Since the Petition Date, approximately $450,000 has been recovered from CLI's loan portfolio including a 65% recovery on one loan sale and a refinance at 100% recovery. In the current loan market, recoveries by other mortgage lenders are far less (typically in

the range of 20 to 47% for first deeds of trust). As of the date of this statement, CLI has remaining loan inventory in the amount of $1.4 million of which the Debtor expects a return of between $200,000 and $300,000 of saleable loans within the next several months. Recovery on the remaining loans may occur if the properties are refinanced or sold. For example, some of the loans are originated under government assisted programs such as California Housing and Finance Authority pursuant to which no payment is made for a period of eight (8) years. Approximately $40,000 to $50,000 of the remaining loans fall into this category. The vast majority of remaining loans are secured by second deeds of trust and have not yet yielded any acceptable bids (either no bids have been received or bids as low as $.03 on the dollar have been received) because of declining property values and defaults resulting in foreclosure by the first position trust deed holder, often times wiping out the entire position of CLI as the second lien holder.

The process of selling the Debtor's loans begins with a pool auction. The Debtor creates data tapes (with detailed characteristics of the assets) containing the specific population of loans and REO properties in which the participating investors have interest. CLI obtains a benchmark of what would be a reasonable bid by obtaining the prevailing property value of the loans through automated valuation resources available. The winning investor then proceeds with the due diligence of the loans. Because of the current market environment and falling real estate prices, CLI has experienced that after due diligence the winning investor may drop their bid price by 30% or more. If that occurs, CLI breaks the trade. In one recent such instance, after breaking a trade on a single loan, CLI spent $300 on a full appraisal, re-marketed the loan and ultimately sold it to another investor. These efforts resulted in recovery of $255,304 instead of $160,650. CLI has also found that in some instances, negotiating loan terms with a borrower to allow the borrower to refinance or sell the property yields a higher return than foreclosure (and also provides a more favorable outcome for the borrower). As an example, a sale of a property by one borrower allowed CLI to recover 100% of its second position loan (roughly $200,000) instead of only $5,000-$10,000, which would have been the return received by selling the second mortgage in a significantly discounted "scratch and dent" market.

        c.      Other Personal Property Asset Recoveries. Other income producing activities

include: (1) pursuit of refunds, REO insurance claims and insurance premium returns (total of $39,000 received to date); (2) collection on active loans being serviced (total mortgage payments recovered of approximately $28,000 to date); (3) collection of missed-borrower payments (collection of approximately $25,000 to date with another $15,000 of additional promised payments thus far); (4) recovery of escheated property (approximately $15,000 to $25,000 in property identified so far to be recovered); and (5) cash/funds management activities earning approximately $26,000 in interest to date.

13. <u>Developments Regarding Other Unliquidated Assets</u>

   a. <u>Madrone</u>. CLI has a 46% interest in a real estate development in Morgan Hill. The scheduled book value of the interest is $1,949,305.17. However, pursuant the 2007 Madrone tax return that CLI received recently, the value of the interest appears to be closer to $3 million as of that time. DMG has spoken to several interested parties about the sale of CLI's interest in Madrone and marketing efforts are ongoing. As a next step, DMG intends to obtain an appraisal of the development to fully establish the current value of CLI's interest. The proposed appraiser has cleared its conflicts check and therefore an application seeking authorization to employ the appraiser will be filed shortly. In view of the current real estate market, depending on the appraisal, CLI may postpone immediate liquidation of its interest. Further advances of the development are also expected to increase the value of the Debtor's interest. Any sale of the Debtor's interest in Madrone will be subject to Court approval following appropriate notice and opportunity for overbid.

   b. <u>Terwin</u>. As previously noted in other filings, CLI has a subordinated interest in an asset-backed security collateralized by residential real estate mortgages known as the "Terwin Micro Asset-Backed Securities, Series 2007-Community1" (the "<u>Security</u>") The book value of the interest as listed in CLI's Schedule B is $4,996,278, but the Debtor's ongoing analysis of the monthly loan servicing reports from the Security indicates that the underlying loan value of CLI's subordinated interest is worth approximately $2.5 million after the June distribution from the Security.

   Much effort has been devoted to obtaining information and documents relevant to the Security. Serious questions have arisen regarding this asset that require further investigation.

Since the date of the First Status Conference, the loan servicer purported to repurchase (the "Repurchase Notice") all remaining loans at a price which would have wiped out CLI's interest without any compensation. The Debtor devoted significant effort to reviewing the agreements, conferring with CLI's former officers and investigating its interest based on available information. Based on this investigation, the Debtor prepared a response to the notice, informing the servicer and related parties that CLI viewed the intended action as constituting a violation of the automatic stay. The Debtor commenced preparation of a complaint for injunctive relief and an application for a temporary restraining order to enjoin the purported action. However, after the Debtor sent its response regarding the automatic stay, the purported Repurchase Notice was withdrawn and therefore the complaint was not filed. Counsel who prepared the Repurchase Notice also appears to have represented multiple parties in the original transaction (including apparently CLI) and may therefore have a conflict of interest. That counsel has indicated that a further notice purporting to repurchase the loans may be forthcoming.

Additionally, the Debtor believes that the underlying Trust Agreement was materially modified after CLI executed the agreement, without CLI's knowledge or consent. Specifically, the evidence reveals that CLI signed the Trust Agreement, acknowledging that the repurchase option price would be 90% of the outstanding balance of the loans. The servicer is now contending that the repurchase option price to be exercised under the Repurchase Notice is set forth in a provision in what is now being asserted as the "final" executed documents and which purports to provide for only 17% of the outstanding amount of the loans. At the agreed 90% buyout, under the Repurchase Notice previously received, it is believed the Debtor would have received proceeds of approximately $2 million. Based on a purchase at 17%, the Debtor would receive zero. This matter requires further review and evaluation to determine the appropriate course of action. The Debtor anticipates formal complaints will be required to pursue the Debtor's claims.

c.  Innergy. CLI owns a 50% interest in Innergy Lending, LLC ("Innergy"), along with World Financial Group, Inc. ("WFG") who owns the other 50%. Innergy was also in the business of brokering loans and faced declining revenues based on market conditions. Following the Petition Date, Richard G. Couch and Sanford A. Knapp joined the Management Committee (which

functions as a board for the limited liability company) on behalf of CLI in order to obtain access to information and to evaluate CLI's interest. WFG holds the other two seats on the Management Committee. After participating in Management Committee meetings and reviewing financial information provided by the managing officer, CLI and WFG accepted the recommendation of management that Innergy be dissolved. The decision to dissolve the company was based on "[Innergy's] lack of sufficient funds from operations and inability to obtain financing." CLI will continue to monitor the shut down of Innergy to determine what may recoverable. CLI believes that it overpaid Innergy $1.7 million (all pre-petition) and therefore asserts a creditor interest as well as an ownership interest. Any recovery in the Innergy matter is speculative at this juncture.

   d. <u>Intellectual Property</u>. CLI owns software referred to as "Seamless." CLI has solicited some interest to date and intends to market the software for sale. CLI also has trademarks and domain names which may have value and will be marketed.

   e. <u>LES.</u> As previously discussed in other pleadings, CLI's wholly-owned subsidiary sold substantially all of its assets prior to the Petition Date. No cash consideration was paid for LES's assets which included software, customers, other intellectual property, and fixed assets. Instead, the consideration was the promise of possible future royalties but only if certain thresholds were met by the purchaser. Subsequent to the Petition Date, the purchaser has indicated it no longer intends to sell and support what is referred to as the ELF product line. Further investigation of the purchaser's sales/royalty reporting and obligations under the purchase agreement is required. In addition, a basis may exist to file a complaint for avoidance of a fraudulent conveyance, among other possible causes of action.

   f. <u>Recoveries Against Third Parties</u>. The Debtors are evaluating all possible claims against third parties. While the review and analysis process is ongoing, there are numerous possible actions to pursue and the Debtors currently estimate recoveries on their quantified claims against third parties range between $3,000,000 and $10,000,000. As one example, the Debtor is investigating possible claims for loan origination fraud. Subject to Court approval, the Debtor intends to retain a specialized firm to provide a forensic audit and analysis of recovery possibilities on approximately 500 identified files worth $90 million in loans advanced where CLI has suffered

DAK
K:\Community Lending\Pld\CH 11 Status Conf(7-10-08)CSv13.doc   7   DEBTORS' CHAPTER 11 STATUS CONFERENCE STATEMENT

Case 08-50030   Doc# 158   Filed: 07/07/08   Entered: 07/07/08 17:54:23   Page 7 of 11

losses. The amount recoverable in such an action is unknown at this time, however preliminary estimates by the mortgage fraud specialists are that $1,000,000 to $3,000,000 of those losses will have attributes favorable for pursuit and recovery.

In addition, the not yet quantified litigation claims may result in greater recoveries to the bankruptcy estates. The Debtors have also not yet completed the preference analysis or the full fraudulent conveyance analysis, which could result in additional recoveries to the bankruptcy estates.

### III. REPORT ON SIGNIFICANT EVENTS SINCE FIRST STATUS CONFERENCE

14. <u>Filing of Plan and Disclosure Statement</u>. As noted above, the Debtors have filed their proposed disclosure statement and plan. In summary, the plan provides for the substantive consolidation of the two estates, liquidation of the Debtors' remaining assets, subject to Court approval following notice where required by the Bankruptcy Code and Bankruptcy Rules, and distribution of cash to creditors in accordance with the priorities of the Bankruptcy Code. The Debtors' liquidation analysis estimates available proceeds at between approximately $10.4 million (if CLI does not prevail in the Top Hat Litigation) and $15.6 million (if the Debtors are successful in the Top Hat Litigation). These estimates do not include unquantified litigation recoveries. Based on information provided by the Debtors' claims agent, general unsecured claims are estimated at between $50 million (Debtors' scheduled debts) and $86 million (combined scheduled and filed claims before reduction for mitigation and disallowance).

15. <u>Business Relocation</u>. Prior to the Petition Date, the Debtors relocated their business premises to a smaller office located in San Jose. As business operations decreased, DMG proposed a move to its warehouse at less cost to the Debtor. The proposed terms were set forth in a notice mailed to parties-in-interest. No objections having been received, an Order was entered on May 27, 2008 authorizing the proposed terms. The Debtors' operations are now conducted out of DMG's warehouse.

16. <u>Top Hat Litigation</u>. As has been discussed previously, several participants in a non-qualified, unfunded, deferred compensation plan established by CLI (the "<u>Top Hat Plan</u>") have filed an adversary proceeding seeking a determination that the funds in the Top Hat Plan belong to the former employees who contributed funds to the Top Hat Plan (the "<u>Adversary Proceeding</u>"). Based

on the underlying documents, CLI believes that the funds held by CLI in the Top Hat Plan are assets of the company, subject to the claims of its general creditors and in the event the company becomes insolvent, the company is precluded from making a distribution to the Top Hat Plan participants ahead of general creditors. The Top Hat Plan participants have the same rights as other general creditors in the funds of the Top Hat Plan.

17. The adversary proceeding is now pending in the District Court before the Honorable James Ware following Plaintiff's motion to withdraw the reference. The Court has issued its scheduling order, setting a discovery cut-off date of December 15, 2008. The Plaintiffs have filed a motion for summary judgment which is scheduled for hearing on October 6, 2008. In their Motion, the Plaintiffs contend that upon termination of the Plan, the participants are afforded an unqualified right to their benefits, regardless of whether the Debtor is solvent. The Debtor intends to oppose the motion and file a cross-motion for summary judgment. The Plaintiffs have propounded extensive discovery to which the Debtor has responded. In the event the matter goes to trial, it is contemplated that the trial will not occur earlier than Spring 2009. If the Debtor prevails in the action, restricted cash in excess of $5 million will be available for distribution to unsecured creditors. If the Plaintiffs prevail, the restricted cash will be payable to the participants in the Top Hat Plan.

18. <u>Email Recovery Effort</u>. In the process of responding to discovery requests propounded by the Plaintiffs in the Top Hat Litigation, DMG discovered that it had only limited access to the full catalog of CLI emails prepared and sent prior to the Petition Date and DMG's involvement with the company. A significant number of emails appear to be missing for several account users and for different ranges of dates. The DMG staff is attempting to rebuild CLI's email server and recover previous backups that may have captured a wider range of dates. It is not clear at this time if this effort will succeed or if additional email backups are available. DMG is also investigating the matter by interviewing account users and former IT personnel to determine the cause for this limited access. At this juncture, the importance or relevance of any deleted emails is unknown.

19. <u>Case Management and Regulatory Compliance Matters</u>. Based on the nature and extent of CLI's business, the time required for day-to-day compliance and other case management

matters is significant. Since these cases were filed, the Debtor estimates that it has received in excess of 2,500 pieces of mail and thousands of inquires. For example, notices are received on a regular basis with respect to a foreclosure or other possibly adverse action. Investigation is required to determine appropriate action that is required, or in some instances that no action is required. The Debtors also receive inquiries from borrowers, former employees with 401(k) inquiries (discussed below), asset purchaser inquiries (the Debtor has received hundreds of expressions of interest via phone and email which have been narrowed to approximately 26 active serious buyers of the Debtor's remaining loans), legal claim and subpoena requests, among many others. Over 16,000 borrower trust/escrow accounts required reconciliation. The Debtors have had two HUD inquires requiring extensive information gathering, analysis and response. Regulatory compliance matters are ongoing. Tax reporting obligations were extensive: for example, this year CLI has processed and mailed 275 Form 1098's, 524 Form 1099's, 214 PayChex created Form 1099's, and 76 PayChex created Form W-2s.

20. Administration of 401(k) Plan. CLI's 401(k) Plan currently has a balance of $2,567,370.07 which is maintained at Transamerica. DMG has assumed management and responsibility for the Plan, with Mr. Couch becoming the named fiduciary/trustee and plan administrator for the 370 remaining plan participants. Efforts since the transition have included responding to an inquiry by the Department of Labor, successfully completing Census and Discrimination testing for the 2007 plan year, investigating 5500 audit requirements, as well as processing approximately one hundred successful account rollovers since the Petition Date. CLI intends to formally terminate the 401(k) Plan as soon as practicable.

### IV. ANTICIPATED EVENTS OVER THE NEXT 90 DAYS

21. Plan Scheduling Matters/Exclusivity. The Debtors intend to notice their proposed final disclosure statement for hearing on the Court's September 25, 2008 calendar. Because the Debtors anticipate additional reserved claims will need to be added to the disclosure statement based on their ongoing review, an amended disclosure statement is anticipated to be filed in the next approximately 30 days. The Exclusivity Order extended the date by which the Debtors are required to obtain acceptance of their plan to maintain exclusivity through and including September 5, 2008.

Thus, the Debtors anticipate a further sixty-day extension of the time will be needed to allow the Debtors to maintain exclusivity while the Debtors solicit acceptance of their Plan. Plan solicitation will occur as soon as possible following the Court's approval of the disclosure statement.

22. <u>Applications for Compensation</u>. DMG and the Debtors' professionals intend to schedule on the Court's August 19, 2008 calendar their applications for compensation for fees and expenses incurred from the Petition Date through June 30, 2008.

23. <u>Continued Chapter 11 Status Conference</u>. The Debtors propose that the Chapter 11 Status Conference be continued to September 25, 2008 to coincide with the proposed hearing date on the Debtors' disclosure statement.

Respectfully submitted,

Dated: July 7, 2008

**MURRAY & MURRAY**
A Professional Corporation

By: */s/ Doris A. Kaelin*
Doris A. Kaelin
Attorneys for Debtors