1  JOHN WALSHE MURRAY (074823)
   ROBERT A. FRANKLIN (091653)
2  DORIS A. KAELIN (162069)
   JENNY L. FOUNTAIN (226241)
3  MURRAY & MURRAY
   A Professional Corporation
4  19400 Stevens Creek Blvd., Suite 200
   Cupertino, CA 95014-2548
5  Telephone: (650) 852-9000; (408) 907-9200
   Facsimile: (650) 852-9244
6  Email: jwmurray@murraylaw.com
   Email: rfranklin@murraylaw.com
7  Email: dkaelin@murraylaw.com
   Email: jlfountain@murraylaw.com
8

9  Attorneys for Debtors

10              UNITED STATES BANKRUPTCY COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                   SAN JOSE DIVISION

13  In re:                              )
                                        )
14  COMUNITY LENDING, INCORPORATED, A   )   Case No. 08-50030-MM-11
    CALIFORNIA CORPORATION, ET AL.*     )
15                                      )
            Debtor.                     )   Chapter 11
16                                      )
    5671 Santa Teresa Blvd, Suite 201   )
17  San Jose, CA 95123                  )   Jointly Administered Chapter 11 Cases
                                        )
18  Employer's Tax ID No.: 94-2673933   )
                                        )
19  ─────────────────────────────────  )
    In re:                              )
20                                      )
    LES LIQUIDATION, INC., A CALIFORNIA )   Case No. 08-50031-MM-11
21  CORPORATION, fka LENDER E-SOURCE INC.)
                                        )
22          Debtor.                     )
                                        )
23  5671 Santa Teresa Blvd, Suite 201   )
    San Jose, CA 95123                  )
24                                      )
    Employer's Tax ID No.: 33-0966517   )
25  ─────────────────────────────────  )

26

27        **DEBTORS' AMENDED JOINT DISCLOSURE STATEMENT
          FOR JOINT PLAN (DATED AUGUST 22, 2008)**

28

DAK JLF

C:\Documents\ComUnity Lending\Pld Plan (Amd 8-22-08) Disc Stmt.doc

**[THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT]**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

**ARTICLE I.** INTRODUCTION ................................................................................ 1

**ARTICLE II.** DEFINITIONS ................................................................................... 2

**ARTICLE III.** DISCLAIMER .................................................................................. 2

**ARTICLE IV.** OVERVIEW OF THE CHAPTER 11 PROCESS AND SUMMARY OF THE
PLAN TREATMENT OF CLAIMS AND INTEREST ..................................... 4
    4.1.    The Chapter 11 Process. ........................................................................... 4
    4.2.    Liquidation Analysis. ................................................................................ 5

**ARTICLE V.** THE BANKRUPTCY FILING .......................................................... 5

**ARTICLE VI.** HISTORY AND DESCRIPTION OF THE DEBTORS' BUSINESSES ............. 5
    6.1.    Events Leading to Debtors' Bankruptcy Cases. ....................................... 7
    6.2.    DMG's Management Activities. ................................................................ 9

**ARTICLE VII.** DEBTORS' ASSETS AND LIABILITIES ..................................... 10
    7.1.    Balance Sheets; Financial Reporting. ...................................................... 10
    7.2.    Cash on Hand. .......................................................................................... 11
    7.3.    Other Assets. ............................................................................................ 11
    7.4.    Liabilities. ................................................................................................ 12

**ARTICLE VIII.** SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE ............. 12
    8.1.    Retention of Professionals. ...................................................................... 12
    8.2.    Appointment of Responsible Individual. ................................................. 12
    8.3.    Rejection of Leases. ................................................................................. 12
    8.4.    Loan Reconciliation. ................................................................................ 13
    8.5.    Records Review. ....................................................................................... 13
    8.6.    Other Bankruptcy Administration Matters. ............................................. 13
    8.7.    Top Hat Litigation. .................................................................................. 14
    8.8.    Liquidation Efforts. ................................................................................. 14
        8.8.1    Sales Outside the Ordinary Course. ...................................... 14
        8.8.2    Sales in the Ordinary Course. ................................................ 15
            8.8.2.1 REO Properties. ........................................................... 15
            8.8.2.2 Loans. .......................................................................... 15
            8.8.2.3 Other Personal Property Asset Recoveries. ................ 16
        8.8.3    Developments Regarding Other Unliquidated Assets. ........... 16
            8.8.3.1 Madrone. ..................................................................... 16
            8.8.3.2 Terwin. ........................................................................ 16
            8.8.3.3 Innergy. ....................................................................... 17
            8.8.3.4 Intellectual Property. ................................................... 18
            8.8.3.5 LES. ............................................................................. 18
            8.8.3.6 Recoveries Against Third Parties ................................. 19
        8.8.4    Other Events and Activities in the Cases. ............................. 19
            8.8.4.1 E&O Insurance. ............................................................ 19
            8.8.4.2 Company Financials and Related Tax Matters. ........... 19

**ARTICLE IX.** THE PLAN OF LIQUIDATION ...................................................... 20
    9.1.    Overview of the Plan. .............................................................................. 20

DMK\HF
R: Comunity Lending Pld Plan/Amd(8-22-08) DiscStmt1.doc

DEBTORS' AMENDED JOINT DISCLOSURE STATEMENT FOR
JOINT PLAN (DATED AUGUST 22, 2008)

| | | | |
|---|---|---|---|
| 9.2. | Claims and Equity Interests and Treatment under the Plan. | | 20 |
| 9.3. | Summary of Claims and Interests; Treatment. | | 20 |
| | 9.3.1 | Administrative Expense Claims - Description. | 21 |
| | | 9.3.1.1 Administrative Expense Claims – Estimate. | 21 |
| | | 9.3.1.2 Administrative Expense Claims – Treatment. | 22 |
| | | 9.3.1.3 Administrative Expense Claims – Deadline for Requests for Payment. | 22 |
| | | 9.3.1.4 Deadline for Objections. | 22 |
| | 9.3.2 | U.S. Trustee Fees. | 23 |
| | 9.3.3 | Tax Claims. | 23 |
| | 9.3.4 | Class 1 (Allowed Secured Claims of Landlords). | 23 |
| | 9.3.5 | Class 2 (Allowed Secured Claims (other than Landlords). | 24 |
| | 9.3.6 | Classes 3 and 4 (Priority Claims). | 25 |
| | 9.3.7 | Class 5 (Timely Filed Unsecured Allowed Claims of $10,000 or Less). | 25 |
| | 9.3.8 | Class 6 (Top Hat Claimants). | 26 |
| | 9.3.9 | Class 7 (Timely Filed Unsecured Claims Greater Than $10,000). | 27 |
| | 9.3.10 | Class 8 (Insider Unsecured Claims). | 28 |
| | 9.3.11 | Class 9 (Late Filed Claims). | 28 |
| | 9.3.12 | Class 10 (Interests). | 28 |
| 9.4. | Implementation of the Plan of Reorganization. | | 28 |
| | 9.4.1 | Financial Information. | 28 |
| | 9.4.2 | Assets. | 29 |
| | 9.4.3 | Disposition of Remaining Assets. | 29 |
| | 9.4.4 | Prosecution of Retained Claims. | 29 |
| 9.5. | Distributions. | | 29 |
| | 9.5.1 | Distribution Account. | 29 |
| | 9.5.2 | Timing of Distributions. | 29 |
| | 9.5.3 | Distribution Addresses. | 29 |
| | 9.5.4 | Withholding Taxes. | 30 |
| 9.6. | Substantive Consolidation. | | 30 |
| 9.7. | Responsible Person. | | 30 |
| 9.8. | Current Management and Consultants. | | 31 |
| | 9.8.1 | DMG. | 31 |
| | | 9.8.1.1 Richard G. Couch. | 32 |
| | | 9.8.1.2 Sanford A. Knapp. | 32 |
| | | 9.8.1.3 Michael J. Cronin. | 33 |
| | | 9.8.1.4 Gerard F. Keena II. | 34 |
| | 9.8.2 | Non-DMG Consultants. | 34 |
| 9.9. | Disbursing Agent. | | 34 |
| 9.10. | De Minimis Distributions. | | 34 |
| 9.11. | Unclaimed Distributions. | | 35 |
| 9.12. | Tax Returns, Payments and Refunds. | | 35 |
| 9.13. | Termination of Employee Benefit Plans. | | 35 |
| 9.14. | Cancellation of Legal Entity. | | 35 |
| 9.15. | Further Orders. | | 36 |
| 9.16. | Insurance Policies. | | 36 |
| 9.17. | Post-Confirmation Employment of Personnel. | | 36 |
| 9.18. | Post-Confirmation Compensation and Reimbursement of Professionals. | | 37 |
| 9.19. | Post Confirmation Notice. | | 38 |
| 9.20. | Post-Confirmation Reports, Fees, and Final Decree. | | 39 |
| | 9.20.1 | U.S. Trustee Fees. | 39 |
| | 9.20.2 | Post-Confirmation Reports. | 39 |
| | 9.20.3 | Final Decree. | 39 |
| **ARTICLE X.** | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 39 |
| 10.1. | Treatment of Executory Contracts and Unexpired Leases. | | 39 |

10.2. Assumption of Executory Contracts and Unexpired Leases.................................39
10.3. Effect of Assumption of Executory Contracts and Unexpired Leases. ......................39
10.4. Adding and Removing Executory Contracts and Unexpired Leases.......................40
10.5. Defaults.................................................................................................40
10.6. Rejection of Executory Contracts and Unexpired Leases.................................40
10.7. Rejection Claims.....................................................................................40

**ARTICLE XI.** PROOFS OF CLAIM; OBJECTIONS...................................................40
11.1. Time for Filing Proofs of Claim. ...............................................................40
11.2. Ownership and Transfers of Claims. ...........................................................41
11.3. Amendments to Claims.............................................................................41
11.4. Claim Objections. ...................................................................................41
11.5. Reserve Accounts...................................................................................42
    11.5.1 Disputed Reserve Account.................................................................42
    11.5.2 Reserve Account for Top Hat Funds. ...................................................42
11.6. Distributions..........................................................................................42

**ARTICLE XII.** RESERVATION OF RIGHTS AND PRESERVATION OF CLAIMS .................42
12.1. All Retained Claims are Preserved. ............................................................42
12.2. Investigation and Prosecution of Retained Claims. .........................................43

**ARTICLE XIII.** RETENTION OF JURISDICTION ....................................................43

**ARTICLE XIV.** OTHER PLAN PROVISIONS............................................................44
14.1. Exemption from Stamp, Transfer and Other Taxes. ........................................44
14.2. Injunctions and Stays...............................................................................44
14.3. Revocation of the Plan.............................................................................44
14.4. Nonconsenual Confirmation.......................................................................44
14.5. Modification. .........................................................................................45
14.6. Setoff/Recoupment. ................................................................................45
14.7. Reservation of Rights...............................................................................45

**ARTICLE XV.** EFFECT OF CONFIRMATION ..........................................................45
15.1. Binding Effect of Plan. ............................................................................45
15.2. Revesting..............................................................................................46
15.3. Full Satisfaction of Claims........................................................................46
15.4. Reservation of Powers. ............................................................................46

**ARTICLE XVI.** RISK FACTORS..........................................................................46
16.1. Additional Claims Risks. ..........................................................................47
16.2. Estimation of Claims and Distribution Risks..................................................47
16.3. Bankruptcy Risks....................................................................................47
16.4. Investment Risks.....................................................................................47
16.5. Collection Risks......................................................................................48

**ARTICLE XVII.** CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......48
17.1. Introduction...........................................................................................48
17.2. IRS Circular 230......................................................................................49
17.3. Consequences to Debtors..........................................................................49
17.4. Consequences to Creditors........................................................................50
17.5. Wage Withholding...................................................................................51
17.6. Backup Withholding.................................................................................51

**ARTICLE XVIII.** VOTING PROCEDURES................................................................52
18.1. Definition of Impairment. .........................................................................52

**ARTICLE XIX.** CONFIRMATION PROCEDURES; OBJECTIONS TO CONFIRMATION .......55
    19.1.    Confirmation Hearing. ...................................................................................55
    19.2.    Requirements for Confirmation of the Plan. ...............................................56
    19.3.    Compliance with Confirmation Requirements. ...........................................57
    19.4.    Cramdown. ...................................................................................................58

**ARTICLE XX.** BEST INTERESTS TEST ...................................................................59

**ARTICLE XXI.** FEASIBILITY ....................................................................................61

**ARTICLE XXII.** POST-CONFIRMATION MANAGEMENT ......................................61

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF EXHIBITS

| | |
|---|---|
| **EXHIBIT A** | LIQUIDATION ANALYSIS |
| **EXHIBIT B** | MONTHLY OPERATING REPORT FOR CLI (JULY 2008) |
| **EXHIBIT C** | MONTHLY OPERATING REPORTS FOR LES (JULY 2008) |
| **EXHIBIT D** | LIST OF NON-DMG CONSULTANTS |

OAK #4876
K:\ConGnity Lending Pld Plan Amd(8-22-08) DiscStmt.doc

DEBTORS' AMENDED JOINT DISCLOSURE STATEMENT FOR
JOINT PLAN (DATED AUGUST 22, 2008)

## ARTICLE I.

## INTRODUCTION[1]

ComUnity Lending, Incorporated ("CLI") and LES Liquidation, Inc., ("LES") (collectively, the "Debtors"), hereby submit their AMENDED JOINT DISCLOSURE STATEMENT FOR JOINT PLAN (DATED AUGUST 22, 2008) (the "Disclosure Statement") in connection with the solicitation of acceptances of the AMENDED JOINT PLAN OF LIQUIDATION (DATED AUGUST 22, 2008) (the "Plan"). The Plan is being transmitted to Creditors and Interest Holders of the Debtors with this Disclosure Statement.

Chapter 11 of the Bankruptcy Code sets forth the rules and procedures under which financially distressed entities may be reorganized or liquidated pursuant to a plan of reorganization presented to Creditors and shareholders for consideration and approval. Confirmation of the Plan is the culmination of that process.

**The Plan provides for the substantive consolidation of the Bankruptcy Estates of CLI and LES upon the Effective Date. The "Effective Date" of the Plan is the first Business Day following the date on which the Order of Confirmation becomes a Final Order.**

The Plan sets forth the Debtors' proposal for the satisfaction, discharge and/or cancellation of all Claims against and Interests in the Debtors. Creditors should thoroughly review both the Plan and the Disclosure Statement before deciding whether to accept or reject the Plan. The purpose of the Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records, that would enable a hypothetical reasonable investor typical of holders of Claims and Interests of the relevant Class to make an informed judgment about the Plan.

Before the Debtors' Disclosure Statement may be used in connection with an acceptance or rejection of the Plan, the Bankruptcy Court, after a noticed hearing, must have approved the Disclosure Statement as containing adequate information to enable Creditors, Interest Holders and parties in interest to make an informed judgment on whether or not to accept or reject the Debtors'

---

[1] Terms not defined herein shall have the meaning ascribed to them in the Joint Plan of Liquidation (Dated July 7, 2008).

K:\ComUnity Lending\Pld-Plan Amd(8-22-08) Disc Stmnt.doc 1 AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN (DATED AUGUST 22, 2008)

Case: 08-50030 Doc #: 186 Filed: 08/22/08 Entered: 08/22/08 14:26:27 Page 8 of 70

1 Plan.

2     *[As set forth in the ORDER APPROVING DISCLOSURE STATEMENT enclosed herewith, the*

3 *Bankruptcy Court approved this Disclosure Statement.]* The Court's approval of the Disclosure

4 Statement however does not constitute an endorsement of the Plan by the Bankruptcy Court.

5     Creditors and Interest Holders should read this Disclosure Statement and the Plan in their

6 entirety prior to voting by way of the enclosed Ballot, which must be completed and returned.

7     No solicitation of votes may be made except pursuant to this Disclosure Statement and

8 Section 1125 of the Bankruptcy Code. In voting on the Plan, Creditors should not rely on any

9 information relating to the Debtors, other than that contained in this Disclosure Statement, the Plan,

10 and all exhibits hereto and thereto, and such other materials approved by the Bankruptcy Court.

11     The Plan that is described in this Disclosure Statement is a liquidating Plan. The Plan's

12 objective is for the Debtors to liquidate all assets, including the prosecution of any Retained Claims

13 held by the Debtors, and distribute the proceeds thereof to the holders of Allowed Claims and

14 Allowed Unclassified Claims in satisfaction of the Debtors' obligations. The Plan divides Creditors

15 and Interest Holders into Classes based on their legal rights and interests and provides for the

16 satisfaction, cancellation or disallowance of Claims and Interests from the Debtors' assets. Interest

17 Holders will not receive or retain anything on account of their Interests.

18 **ARTICLE II.**

19 **DEFINITIONS**

20     All definitions contained in Article I of the Plan are incorporated herein by reference. Other

21 terms are defined herein for convenience only.

22 **ARTICLE III.**

23 **DISCLAIMER**

24 **THIS DISCLOSURE STATEMENT CONTAINS INFORMATION CONCERNING**

25 **YOUR CLAIMS OR INTERESTS. PLEASE READ THIS DOCUMENT WITH CARE. FOR**

26 **THE CONVENIENCE OF CREDITORS AND INTEREST HOLDERS, THIS DISCLOSURE**

27 **STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF**

28 **CONTROLS OVER THIS SUMMARY. IF ANY INCONSISTENCIES EXIST BETWEEN**

THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FINANCIAL CONDITIONS OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. IN ADDITION, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, THE INFORMATION CONTAINED HEREIN MAY BE INCOMPLETE OR INACCURATE. FOR THE FOREGOING REASONS, THE DEBTORS AND THEIR RESPECTIVE PROFESSIONALS ARE UNABLE TO WARRANT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

THE PROFESSIONALS REPRESENTING THE DEBTORS HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT AND HAVE NOT INDEPENDENTLY VERIFIED THE FACTUAL INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. ANY TAX ADVIDCE HEREIN WAS AND IS NOT INTENDED TO BE USED, AND IT CANNOT BE USED, FOR THE PURPOSE OF AVOIDING ANY TAX PENALTIES THAT MAY BE IMPOSED ON ANY PERSON. THERE IS NO LIMITATION IMPOSED ON ANYONE READING THIS DISCLOSURE STATEMENT ON DISCLOSURE OF THE TAX TREATMENT OR TAX STRUCTURE OF ANY TRANSACTION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED OR REFERENCED IN PROMOTING, MARKETING OR

RECOMMENDING A PARTNERSHIP OR OTHER ENTITY, INVESTMENT PLAN, OR ARRANGEMENT TO ANY PERSON. YOU SHOULD CONSULT WITH YOUR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING YOUR CLAIM OR INTEREST.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT, OR DETERMINED IF IT IS TRUTHFUL OR COMPLETE.

## ARTICLE IV.

### OVERVIEW OF THE CHAPTER 11 PROCESS AND SUMMARY OF THE PLAN TREATMENT OF CLAIMS AND INTEREST

### 4.1. The Chapter 11 Process.

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide debtors with "breathing space" within which to propose a restructuring of their obligations to third parties. The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Cases), a debtor remains in possession and control of all of its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day to day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a chapter 11 case. The Bankruptcy Court can, however, grant relief from the automatic stay, under certain specified conditions or for cause.

A chapter 11 debtor may propose a plan providing for the reorganization of the debtor or for, as the Debtors' Plan contemplates, the orderly liquidation and administration of the assets of the estate. A plan may either be consensual or non-consensual and provides, among other things, for the treatment of the claims of creditors and interests of shareholders.

**4.2.    Liquidation Analysis.**

The Debtors have prepared a liquidation analysis (the "Liquidation Analysis") which is attached hereto as **Exhibit "A."**[2]  The Liquidation Analysis provides the Debtors' current best estimates of potential distributions under the Plan based on certain assumptions, as set forth more fully in the Liquidation Analysis.  Two spreadsheets are included at **Exhibit "A."**  The first assumes the Debtors prevail in the Top Hat Litigation (thereby increasing the Estate's cash by in excess of $5 million); the second assumes the Debtors do not prevail in the Top Hat Litigation, and therefore such cash does not belong to the Estates.

**ARTICLE V.**

**THE BANKRUPTCY FILING**

On January 4, 2008 (the "Petition Date"), the Debtors filed their respective Voluntary Petitions under Chapter 11 of the Bankruptcy Code and are acting as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  On January 17, 2008, this Court entered its ORDER GRANTING MOTION FOR ORDER AUTHORIZING AND DIRECTING JOINT ADMINISTRATION OF ESTATES AND APPROVING CAPTIONS pursuant to which the Court ordered the joint administration of these Cases.

As of the date of this Disclosure Statement, no creditors' committee has been formed in either case.

**ARTICLE VI.**

**HISTORY AND DESCRIPTION OF THE DEBTORS' BUSINESSES**

CLI is a mortgage lender incorporated in 1980 and is an S-Corporation with 100% of the shares owned by W. Darryl Fry ("Mr. Fry").  Historically, CLI was in the business of originating, brokering, servicing and selling residential mortgages.  CLI received periodic origination fees for originating loans and management fees for servicing loans.  In addition, CLI obtained and sold real-estate owned ("REO") properties acquired through foreclosure upon borrower defaults.  As of the Petition Date, CLI had ceased all loan origination operations.  CLI's post-petition operations have focused on selling its remaining loans and REO properties, completing foreclosures and liquidating

---

[2] All exhibits attached hereto are incorporated herein by reference.

DAK JLF
K. Claiborne\Pending Pld\Plan (Amds-22-08) DisclStmt.doc

5    AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR
JOINT PLAN (DATED AUGUST 22, 2008)

1   its other assets.

2       CLI was headquartered in Morgan Hill, California prior to the Petition Date. As operations

3   decreased, CLI's need for office space decreased. CLI currently conducts its limited operations out

4   of Livermore, California utilizing warehouse and office space owned by the company managing its

5   operations (DMG), as discussed below.

6       Since its inception, CLI expanded from a regional one-person operation to, at one point,

7   ninety branch offices in forty-four states employing an estimated 2,000 employees. During its

8   expansion, CLI opened multiple Mortgage Access Centers ("MACs") and retail outlets. In 1993,

9   CLI closed $1.5 billion in loans. In 2004, CLI funded $3.5 billion in loans, making it the 75th

10   largest mortgage-banker in the country. CLI originated approximately $2 billion in loans in the first

11   nine months of 2007. As part of its earlier expansion, LES was incorporated on April 17, 2001 as a

12   wholly-owned subsidiary of CLI. CLI has vacated all locations other than the office located in

13   Livermore, California.

14       As part of its original business, CLI would originate and fund loans via various short term

15   warehouse lines of credit (the "Warehouse Credit Facilities") from various financial institutions

16   including, among others, First Collateral Services, Washington Mutual, Greenwich and GMAC –

17   RFC (collectively, the "Warehouse Lenders"). After originating and funding loans, CLI sold

18   substantially all originated and funded loans (the "Loan Sales") to various investors, including,

19   among others, Morgan Stanley, Merrill Lynch, IndyMac and Countrywide Home Loans

20   (collectively, the "Investors"). The Loan Sales enabled CLI to service the various Warehouse Credit

21   Facilities so that CLI could fund additional loans. Additionally, certain of the Investors would

22   bundle the purchased loans and issue securities, backed by these loans and mortgages, to private

23   third-party investors. In the event of loan defaults or delinquencies and/or upon the occurrence of

24   other conditions, subject to the terms of the applicable Loan Sales' documents, the Investors could

25   require CLI to repurchase said loans (the "Repurchase Requests").

26       LES provided web-based solutions that allowed lenders to manage the wide variety of

27   constantly changing loan products and underwriting guidelines through a searchable, automatically

28   managed loan guideline library.

Case: 08-50050 Doc# 180 Filed: 08/22/08 Entered: 08/22/08 14:26:47 Page 13 of 70

In the fall of 2007, Mortgage Resource Center, Inc. ("Allregs") acquired substantially all of LES's assets pursuant to the terms of an Asset Purchase Agreement (the "Allregs APA") dated September 28, 2007. In exchange, LES received the rights to a defined portion of Allregs' revenue during the twenty-four month period following October 1, 2007. Concurrently, LES ceased all operations and terminated all remaining employees.

CLI began to experience the effects of the country-wide mortgage crisis in the spring of 2007. The situation deteriorated throughout the summer and by the fall of 2007 CLI's financial difficulties necessitated the engagement of outside professional assistance to advise and manage CLI's business operations. As a result, CLI entered into discussions with Diablo Management Group ("DMG") to assist in the restructuring, management, and potential liquidation of CLI. On October 25, 2007, the CLI Board of Directors passed a series of resolutions to, among other things, retain DMG and to appoint Richard G. Couch ("Mr. Couch"), founder and Chairman of DMG, as CLI's Chief Executive Officer and board member. Concurrently therewith or soon thereafter, all other officers and directors of CLI resigned and DMG assumed responsibility for all day to day operations of CLI. On November 20, 2007, the CLI Board adopted a resolution electing Mr. Sanford A. Knapp ("Mr. Knapp") as Assistant Secretary. A summary of DMG's activities and progress on behalf of CLI is described below. Additional information about DMG is available at DMG's website: www.diablomanagement.com.

On December 6, 2007, the LES Board of Directors (the "LES Board") passed a resolution wherein all LES Board members resigned and Mr. Couch was appointed the Chief Executive Officer and sole board member. Additionally on December 6, 2007, the LES Board passed a resolution wherein Mr. Knapp was elected Assistant Secretary. As noted above, LES was not operating as of the Petition Date.

### 6.1.    Events Leading to Debtors' Bankruptcy Cases.

Over the past two years, the real estate market has experienced a significant down-turn and borrower defaults have risen to record levels. The inordinate number of borrower defaults and subsequent foreclosures has led to a credit crisis in the mortgage industry causing the shuttering of a vast majority of the country's mid-sized and independent mortgage bankers such as CLI. Starting in

DAK JLF

7    AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN OF...

Case: 08-50030    Doc# 130    Filed: 08/22/08    Entered: 08/22/08 14:29:42    Page 14 of 70

early 2007, with escalating borrower defaults, the Investors and Warehouse Lenders began to place severe financial strain on CLI. Industry wide, Investors changed their criteria for purchasing new loans from originators, making it more difficult for CLI to sell newly funded loans. The Investors also began making Repurchase Requests at a level unsustainable by CLI. At their pre-petition peak, outstanding Repurchase Requests totaled $45 million and on the Petition Date the Repurchase Requests totaled over $30 million. Moreover, as CLI's outstanding credit balance with Warehouse Lenders began to rise due to CLI's inability to sell new loan inventory to Investors, the Warehouse Lenders began to exercise remedies against CLI, including sweeping CLI's accounts via "Curtailments" and refusing to release the collateral for CLI-owned loans despite the Warehouse Lenders' full recovery of their funding advances from the Curtailments.

CLI's outstanding Repurchase Request obligations continued to increase and peaked in the July to September 2007 timeframe. This caused a situation whereby CLI could no longer service its debt. In addition, CLI was served and named in multiple legal actions, including actions by borrowers, equipment lessors, vendors, and prior employees during the same period. The legal actions filed against CLI included, among others, a lawsuit brought by several former employees for the turnover of approximately $3.8 million (pre-petition) in Top Hat Plan Funds, (the "Top Hat Litigation")[3]; a lawsuit filed by Gevity H.R., CLI's former human resources provider, seeking damages of approximately $500,000 (the "Gevity Litigation"); a Truth-in-Lending Act purported class action (the "Brooks Litigation"), with unknown but potentially multi-million dollar claims; an SEC investigation; state administrative actions; suits by individual borrowers; a suit by Banc of America, CLI's major equipment lessor; and suits by former employees for alleged back wages. As a result of the mounting pressures and obligations, CLI was forced to seek a crisis management specialist to address these issues, to terminate loan origination operations and to significantly scale back operations of company.

/ / /

---

[3] Since the Petition Date, additional persons have joined the Top Hat Litigation as plaintiffs and the total amount of Top Hat Funds subject to the turnover litigation has increased. Those participants in the Top Hat Plan who had not joined as plaintiffs were joined by CLI so that all Top Hat Claimants would be bound by any judicial determination in the action.

## 6.2. **DMG's Management Activities**.

DMG's engagement pre-petition began with a moratorium imposed on all unsecured creditor payments and actions were taken to protect and preserve company assets. These actions included, among other things, written and verbal communications with all creditor constituencies (including trade Creditors, landlords, then current and former employees, Investors and Warehouse Lenders), continued direct discussions with active and aggressive collection and litigation parties, and management of ongoing and critical disputes, both threatened and underway.

Post-petition plans and activities have generally focused on borrower inquiries, creditor inquiries, PPD servicing inquiries, 401(k) inquiries, legal claim and subpoena requests, asset purchaser prospect inquiries, broker inquiries, other service provider contacts, and various CLI constituency communications. Significant administrative activity in the operational context has been necessary including the processing of thousands of pieces of mail, facility moves, information technology / systems transitions, as well as moving, inventorying, filing, accessing and ongoing management of 600+ boxes of records located at DMG's warehouse, as well as 10,000+ boxes of records in various Iron Mountain locations.

With the closure of its branch offices and downsizing, all of CLI's employees, which numbered over twenty-five at the time of DMG's engagement, were terminated (as employees) and on a part-time or full-time basis, a small number of essential former employees have been recruited, engaged, and managed (as contractors) in roles that are essential to the Debtors' performance of certain requirements of their duties as debtors in possession, as well as the operational processes through which a variety of assets have been identified, managed, and converted to cash for creditors.

The total cash generation for CLI under DMG management from October 25, 2007 to the date of this Disclosure Statement, on a gross basis is over $6 million. Pre-petition gross proceeds were over $4 million, with net proceeds to CLI of approximately $2 million after payoff of collateral-backed advances and associated costs. Post-petition revenues as of July 31, 2008 per CLI's monthly operating report were over $2.2 million. Liquidation efforts by DMG through the date of this Disclosure Statement are discussed in more detail at Section 8.8 below.

DMG has also devoted significant effort to various regulatory issues affecting CLI. Special

regulatory counsel has been employed as special counsel in the CLI case pursuant to approval of the Bankruptcy Court. CLI, under DMG management, has surrendered its mortgage licenses in more than forty-five states, has completed approximately twenty-seven SOS / Foreign Corporation closures and is waiting for confirmation of another twenty-one SOS / Foreign Corporation withdrawal requests that have been submitted – all of which benefit the Bankruptcy Estates by avoiding further business and regulatory fees, penalties and other potential exposure. CLI has also successfully responded to multiple regulatory inquiries including two HUD investigations.

DMG has assumed management and responsibility for CLI's 401(k) plan, with Mr. Couch becoming the named fiduciary/trustee and plan administrator for the currently 351 remaining plan participants. The Plan balance is $2,266,247.99 as of the date of this Disclosure Statement. Efforts since the transition have included effectively dealing with a Department of Labor inquiry triggered by former employees' complaints, successfully completing Census and Discrimination testing for the 2007 plan year, investigating 5500 audit requirements, as well as processing approximately two hundred distribution requests since October 25, 2007, which includes 105 successful account rollovers since the Bankruptcy filing. CLI intends to formally terminate the 401(k) plan as soon as practicable.

In addition to the retention of the professionals described at Section 8.1 below, DMG also intends to engage, with the Court's approval, professionals that specialize in forensic audit, business/financial analysis, and recovery of losses due to loan related fraud, as well as appraisers for certain CLI assets, most notably the Madrone real estate development, as defined below in section 7.3.2. Additional special counsel may also be engaged to pursue litigation recoveries against third parties.

## ARTICLE VII.

## DEBTORS' ASSETS AND LIABILITIES

### 7.1.   Balance Sheets; Financial Reporting.

The Debtors have filed monthly operating reports in these cases reporting all receipts and disbursements during the pendency of these cases. Attached hereto as **Exhibits "B"** and **"C"** are the most recently filed monthly operating reports (July 2008) for CLI and LES, respectively, including a

balance sheet.

**7.2.** <u>**Cash on Hand.**</u>

As of July 31, 2008, the Debtors combined unrestricted cash on hand totals $2,434,047.44. These funds are held in an authorized debtor in possession bank account.

**7.3.** <u>**Other Assets.**</u>

7.3.1    CLI's primary mortgage-related assets include its remaining loan inventory, loans in foreclosure and REO properties, along with associated servicing payment rights. A summary of sale efforts as of the date of this Disclosure Statement is provided at Section 8.8 below.

7.3.2    CLI is a member of Madrone Investments, LLC ("<u>Madrone</u>"), a limited liability company created on or about September 23, 2004 to own and develop property into a residential subdivision in Morgan Hill, California. CLI has a 46.944% membership interest in Madrone but the property has not been fully developed. Further discussion of Madrone is provided at Section 8.8.3.1 below.

7.3.3    CLI owns a subordinated interest in a mortgage-backed security, the Terwin Mirco Asset-Backed Security, Series 2007 ComUnity1 (the "<u>Security</u>") that was issued and purportedly closed on September 27, 2007. Further discussion of the Security is provided at Section 8.8.3.2 below.

7.3.4    CLI is a fifty percent (50%) member in Innergy Lending, LLC ("<u>Innergy</u>") which, when operating, was in the business of brokering residential mortgages. World Financial Group Inc. ("<u>WFG</u>") is also a fifty percent (50%) member in Innergy. Currently, Innergy is in the process of dissolving under state law and pursuant to the operating agreement. Further discussion of this asset is provided at Section 8.8.3.3 below.

7.3.5    LES's primary asset is the right to royalty payments from a revenue sharing arrangement with Allregs for a period of 24 months, pursuant to the terms of the Allregs APA. The Allregs APA sets minimum monthly sales targets which must be achieved before the revenue sharing is triggered. As such, the value of this asset is not presently quantifiable. In addition, Allregs has informed LES that it no longer intends to sale and support all assets sold to it pursuant to the Allregs APA and that it intends to continue to use only a portion of the technology purchased

from LES.  Further discussion of this asset is provided at Section 8:8.3.5 below.

        7.3.6   As discussed below, the Debtors also believe they have various claims against certain of the above third partie as well as others which will be investigated and pursued as appropriate.

**7.4.**   **Liabilities.**

The liabilities of and equity security interest in the Debtors are reflected in Article IX below.

**ARTICLE VIII.**

**SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE**

**8.1.**   **Retention of Professionals.**

Prior to the commencement of the Cases, the Debtors retained the following professionals to assist in their liquidation efforts: (i) Murray & Murray, A Professional Corporation, as general bankruptcy counsel; (ii) Buchalter Nemer, A Professional Corporation, as special regulatory and corporate and employment counsel; and (iii) Rothstein Kass as tax and accounting advisors. Subsequent to the Petition Date, Omni Management Group was retained as Debtors' claims agent (the "Claims Agent"). The Bankruptcy Court approved the Debtors' employment of these professionals, effective as of the Petition Date.  The Debtors have continued, and pursuant to the Plan and applicable law will continue, the management services of DMG.   Bankruptcy Code Section 327(b) provides that if a trustee is authorized to operate the business of the Debtors under Section 1108 of the Bankruptcy Code, and if the Debtors have regularly employed attorneys, accountants, or other professional persons on salary, the trustee may retain or replace such professional persons if necessary in the operation of such business.

**8.2.**   **Appointment of Responsible Individual.**

Pursuant to orders entered by the Bankruptcy Court, Mr. Couch has been appointed the Responsible Individual in both Cases.

**8.3.**   **Rejection of Leases.**

Immediately following the Petition Date, CLI identified real property and personal property leases to be promptly rejected in order to reduce potential administrative claims against the Bankruptcy Estates.  These motions were granted at a hearing held on February 8, 2008.

**8.4.  Loan Reconciliation.**

Following the Petition Date, CLI also completed a reconciliation of approximately 16,000 consumer loans and a motion was filed with the Court requesting authority to pay over to the appropriate persons funds held in trust by CLI for borrowers in the nature of impounds for taxes and insurance and the like.  That motion was granted following a hearing held on February 8, 2008 and approximately $110,000 in trust-related funds have been paid to the appropriate third parties representing 275 impacted borrower accounts.

**8.5.  Records Review.**

Extensive records review has been undertaken by DMG and is ongoing to understand historical operations and transactions of CLI's business.  For example, approximately sixty banking and other financial accounts were located and identified as requiring analysis for transaction review purposes. Other examples include the identification and analysis of more than 26,000 vendors listed in CLI's accounting system and 40,000-70,000 of line item entries exported from the general ledger per month, which, in some instances represent over $1 billion in transaction entries. Additionally, of the approximately 40,000 loans CLI has originated over the last three years, over 500 have now been identified as containing potential characteristics of fraud and require further forensic audit. Separately, as mentioned above, 16,000 loans were reviewed for borrower trust account reconciliations, with approximately 3,000 of those loans having positive or negative amounts due and requiring further action.  A final example includes the Debtors' human resources records review, which is vast due to the large number of employees.  The records review has been complicated by the fact that, for a significant period of time leading up to the Bankruptcy filing, all employee matters were administered through a third party provider, from whom records have been unavailable, or difficult to obtain in a timely manner.

**8.6.  Other Bankruptcy Administration Matters.**

The Schedules (as defined in section 8.8.4.2 below) for both CLI and LES were filed on February 22, 2008.  The Debtors are current on their Monthly Operating Reports.

The Debtors have responded to information requests by the Office of the United States Trustee and have attended meetings as requested.

**8.7.** **Top Hat Litigation.**

All pre-petition litigation against the Debtors has been stayed. However, as indicated above, several participants in the Top Hat Plan have filed the Top Hat Litigation, an adversary proceeding seeking a determination that the funds in the Top Hat Plan belong to former employees who contributed funds to the Top Hat Plan. The Plaintiffs filed substantially the same action prior to the Petition Date pursuant to which they sought and obtained a temporary protective order and writ of attachment. Based on the underlying documents, the Debtors believe that the funds held by CLI in the Top Hat Plan are assets of CLI, that in the event CLI becomes insolvent, CLI is precluded from making a distribution to the Top Hat Plan participants ahead of general unsecured Creditors and that the Top Hat Plan participants have the same rights as other general unsecured Creditors in the funds of the Top Hat Plan. The Plaintiffs in the Top Hat Litigation filed a motion to withdraw the reference which was granted and the Top Hat Litigation is currently before the United States District Court, San Jose Division. The Plaintiffs have filed a motion for summary judgment. Opposition is due on September 1, 2008 and the motion is scheduled for hearing on October 2, 2008 before the Honorable James Ware. CLI intends to oppose the motion and to file a cross motion for summary judgment to be heard at the same time.

The Debtors have expended very significant time and resources in complying with the document discovery requirements of this case, sorting and filtering through thousands of emails and other electronic documents and many boxes of records. The Debtors ultimately submitted eight large binders of information and other material to opposing counsel.

The funds attributable to the Top Hat Plan total in excess of $5 million and therefore the outcome of that matter has significant consequence for the Debtors' Creditors.

**8.8.** **Liquidation Efforts.**

8.8.1  Sales Outside the Ordinary Course. Pursuant to Court order, CLI is in the process of selling or has sold certain assets that fall outside the ordinary course of business, including several automobiles and various personal property, via auction and direct sales. The results of recent auction(s) resulted in overall sale proceeds in excess of the established minimums: the established minimum prices totaled $41,345 and the auction yielded total sale proceeds of

1    $51,050. After payment to the auctioneer, CLI received $43,392.50. The Debtors also received

2    post-petition payment from the auctioneer from pre-petition auctions in the amount of $38,984.40,

3    bringing the total amount realized from auction sales to $82,376.90. The Debtors anticipate that the

4    sale of CLI's remaining office furniture and equipment will occur at a later date when such items are

5    no longer needed (proceeds from which are expected to be nominal).

6             8.8.2    Sales in the Ordinary Course. The Debtors are continuing to liquidate assets

7    that are within the ordinary course of their businesses, including loans and REO properties. A

8    description of these assets and recoveries to-date is described below:

9             8.8.2.1    REO Properties. CLI has completed the sale of most of CLI's the

10    REO properties in its portfolio. As of July 1, 2008, the company had sold nine REO properties for a

11    net of $1,079,470, and two of the four remaining REO properties were in escrow (one of these

12    properties has since closed in July for a net to CLI of $149,039, and the other remains in escrow).

13    The final two REO properties had a combined listing value of $91,900 as at June 30, 2008.

14             8.8.2.2    Loans. Since the Petition Date, approximately $540,000 has been

15    recovered from CLI's loan portfolio including a 65% recovery on one loan sale, a refinance at 100%

16    recovery on another loan that was funded under fraudulent circumstances, and the sale of another

17    very tarnished loan asset at 57% of the unpaid principal balance. In the current loan market,

18    recoveries by other mortgage lenders are far less (typically in the range of 20 to 47% for first deeds

19    of trust). As of the date of this Disclosure Statement, CLI has remaining loan inventory in the

20    amount of $1.25 million, from which the Debtors expect a $100,000 - $150,000 return on saleable

21    loans within the next several months. Recovery on the remaining loans may occur if the properties

22    are refinanced or sold. For example, some of the loans are originated under government assisted

23    programs such as the California Housing and Finance Authority pursuant to which no payment is

24    made for a period of eight (8) years. Approximately $40-50,000 of the remaining loans fall into this

25    category. The vast majority of remaining loans are secured by second deeds of trust and have not

26    yet yielded any acceptable bids (i.e., either no bids have been received or bids were as low as $.03

27    on the dollar) because of declining property values and defaults resulting in foreclosure by the first

28    position deed of trust holder, often times eliminating any return for CLI as the second lien holder.

DAK JLF
K:\Cellu\Pldg\Disclosure(2008)Disclosure.doc    15   AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN DATED AUGUST 22, 2008

Case: 08-50030    Doc #186    Filed: 08/22/08    Entered: 08/22/08    Page 22 of 70

8.2.3 <u>Other Personal Property Asset Recoveries</u>. Other income-producing activities as of July 31, 2008 include: (1) pursuit of refunds, REO insurance claims and insurance premium returns (total of $67,000 received); (2) collection on active loans being serviced (total mortgage payments recovered of approximately $37,000); (3) collection of missed-borrower payments (collection of approximately $27,000, with another $15,000 of additional promised payments thus far); (4) recovery of escheated property (approximately $25,000 in property identified so far and in various stages of research or claims process); and (5) cash/funds from management activities which have earned approximately $37,000 in interest to date.

8.8.3 <u>Developments Regarding Other Unliquidated Assets</u>.

8.8.3.1 <u>Madrone</u>. As provided above, CLI has a 46.944% interest in a real estate development in Morgan Hill. The scheduled book value for the interest is $1,949,305.17. However, a preliminary review of the 2007 Madrone tax return that CLI has recently received reveals that the value of CLI's interest was closer to $3 million at that time. DMG has spoken to several interested parties about the sale of CLI's interest in Madrone, and CLI intends to continue to market its interest in Madrone and obtain an appraisal of the development to establish the current value of CLI's interest. An application will be filed shortly seeking approval of employment of an appraiser. In view of the current real estate market, depending on the appraisal CLI may postpone immediate liquidation of its interest. As the development advances, the value of CLI's interest should increase. Any sale of the CLI's interest in Madrone will be subject to Court approval following appropriate notice and opportunity for overbid.

8.8.3.2 <u>Terwin</u>. As previously noted, CLI has a subordinated interest in the Security. The book value of the interest as listed in CLI's Schedule B is $4,996,278, but the Debtors' ongoing analysis of the monthly loan servicing reports from the Security indicate that the underlying loan value of CLI's subordinated interest is estimated to be worth approximately $2.5 million.

Much effort has been devoted to obtaining information and documents relevant to the Security. Serious questions have arisen regarding this asset that require further investigation. Recently the loan servicer purported to repurchase (the "<u>Repurchase Notice</u>") all remaining

loans at a price which would have eliminated CLI's interest without any compensation. The Debtors devoted significant effort to reviewing the agreements, conferring with CLI's former officers and investigating its interest based on available information. Following this investigation, the Debtors prepared a response to the notice, informing the servicer and related parties that CLI viewed the intended action as constituting a violation of the automatic stay. The Debtors commenced preparation of a complaint for injunctive relief and an application for a temporary restraining order to enjoin the purported action. However, the purported Repurchase Notice was withdrawn and the complaint was not filed. Counsel who prepared the Repurchase Notice also appears to have represented multiple parties in the original transaction (including apparently CLI) and may therefore have a conflict of interest. That counsel has indicated that further notices and demands regarding repurchase of the loans may be forthcoming.

The Debtors believe that the underlying Security Trust Agreement ("Trust Agreement") was materially modified after CLI signed the agreement, without CLI's knowledge or consent. Specifically, the evidence available to the Debtors at this time suggests that CLI signed the Trust Agreement, acknowledging that the repurchase option amount price would be 90% of the outstanding balance of the loans. The servicer is now contending that the purchase option price to be exercised under the Repurchase Notice as is set forth in a provision in what is now being asserted as the "final" executed documents and which purports to provide for only 17% of the outstanding amount of the loans. At the agreed 90% buyout, under the Repurchase Notice previously received, it is believed the Debtors would have received proceeds of approximately $2 million. Based on a purchase at 17%, the Debtors would receive zero.

As of the present date, the Winter Group has made a request that CLI consent to the re-issuance of the Terwin Security to correct errors in documentation that affect taxation issues. CLI is currently evaluating its response.

This matter requires further review and evaluation to determine the appropriate course of action. The Debtors anticipate formal complaints will be required to pursue the Debtors' claims.

8.8.3.3 Innergy. As indicated above, CLI and WFG each hold a 50% member interest in Innergy. Innergy was also in the business of brokering loans and faced declining

1    revenues based on market conditions.  Following the Petition Date, Mr. Couch and Mr. Knapp

2    joined the Innergy management committee  ("Management Committee") on behalf of CLI, which

3    functions as a board of directors for the limited liability company, in order to obtain access to

4    information and to evaluate CLI's interest.  WFG holds the other two seats on the Management

5    Committee.  After participating in Management Committee meetings and reviewing financial

6    information provided by the managing officer, CLI and WFG accepted the recommendation of

7    management that Innergy be dissolved.  The decision to dissolve the company was based on

8    "[Innergy's] lack of sufficient funds from operations and inability to obtain financing."  CLI will

9    continue to monitor the shut down of Innergy to determine what may recoverable.  CLI believes that

10   it overpaid Innergy $1.7 million (all pre-petition) and therefore asserts a creditor interest as well as

11   an ownership interest.  In light of Innergy's financial condition, further analysis is also required to

12   determine whether any avoidance action recoveries may exist.  For example, the Debtors believe

13   WFG received a $1.2M payment in October 2007.  However, the Debtors do not know at this time

14   the purpose or propriety of such payment pending receipt of further information.  Any recovery in

15   the Innergy matter is speculative at this juncture.

16               8.8.3.4   Intellectual Property.  CLI owns software referred to as "Seamless."

17   CLI has solicited some interest to date and intends to market the software for sale.  CLI also has

18   trademarks and domain names which may have value and will be marketed.  Expectations on present

19   market value remain very conservative.

20               8.8.3.5   LES.  As previously discussed, CLI's wholly-owned subsidiary sold

21   substantially all of its assets prior to the Petition Date.  No cash consideration was paid for LES's

22   assets which included software, customers, intellectual property, and fixed assets.  The essential

23   consideration was the promise of possible future royalties but only if certain thresholds were met by

24   the purchaser.  Subsequent to the Petition Date, the purchaser has indicated it no longer intends to

25   sell and support what is referred to as the ELF product line which significantly impacts the prospect

26   of future royalties.  Further investigation of the purchaser's sales/royalty reporting may be required,

27   in addition to the possible filing of a complaint for avoidance of a fraudulent conveyance, among

28   other possible causes of action.

1    8.8.3.6   Recoveries Against Third Parties.  The Debtors are evaluating all
2 possible claims against third parties.  While the review and analysis process is ongoing, there are
3 numerous possible actions to pursue.  The Debtors' Liquidation Analysis assumes recoveries on
4 claims against third parties that have been estimated.  See **Exhibit "A"** for details.  As one example,
5 the Debtors are investigating possible claims for loan origination fraud.  Subject to Court approval,
6 the Debtors intend to retain a specialized firm to provide a forensic audit and analysis of recovery
7 possibilities on approximately 500 identified files worth $90 million in loans advanced where CLI
8 has suffered losses.  The amount recoverable in such an action is unknown at this time, however
9 preliminary estimates by the mortgage fraud specialists are that as much as $1,000,000 to
10 $3,000,000[4] of those losses will have attributes favorable for pursuit and recovery.  All potential
11 litigation recoveries have not yet been quantified pending further review.  The Debtors have not yet
12 completed an exhaustive preference analysis or exhaustive fraudulent conveyance analysis, which
13 once complete, may indicate that there are additional recoveries that the Liquidating Debtor may
14 pursue.

15        8.8.4   Other Events and Activities in the Cases.

16            8.8.4.1   E&O Insurance.  CLI's E&O insurance annual term policy expired
17 on or about May 22, 2008. On behalf of CLI, DMG applied for a reporting period tail but the
18 application was ultimately denied by the insurance carrier.  Additionally, with the assistance of
19 counsel, substantial effort was expended in reviewing and investigating CLI's potential claims and
20 rights under the policy and in researching historical activities at CLI to determine any potential
21 claims. Upon completion of such research and concurrent with the policy tail request, a Notice of
22 Claim was submitted to the E&O Insurance provider, explaining the initial factual basis for events
23 that caused, at minimum, $750,000, and possibly as much as $1.5 million in, verifiable losses to
24 CLI.  CLI is currently awaiting a response from the insurance provider.

25            8.8.4.2   Company Financials and Related Tax Matters.  DMG spent
26 substantial time and effort completing the Q4 2007 monthly financial records for both Debtors, as

27

28    [4] For purposes of the Debtor's Liquidation Analysis, the Debtors have conservatively estimated those recoveries at between $600,000 and $1,000,000.

DAK:JLF
R: (Confirmation Hearing Pld Pkg/Amd(8-22-08)) DiscStmt.doc
-19- AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN (DATED AUGUST 22, 2008)
70

Case 08-50030    Doc# 186    Filed: 08/22/08    Entered: 08/22/08 15:27:11    Page 26 of

well as the 2007 year-end Financials. This was necessary not only for BANKRUPTCY SCHEDULES OF ASSETS AND LIABILITIES ("Schedules") and Statement of Financial Affairs ("Sofas") reporting purposes, but also for the Debtors' consolidated tax returns, the preparation of which is currently in progress. Timely tax filing extensions and related payments have been made in the approximately 25 states where required, with an additional 20 state extensions being covered by the Federal filing extension. It is anticipated the Debtors' 2007 Tax Returns will be finalized for filing prior to the new extended filing deadline of September 15, 2008.

## ARTICLE IX.

## THE PLAN OF LIQUIDATION

### 9.1.    Overview of the Plan.

The following is only a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. Creditors, Interests Holders and other parties in interest are urged to review the Plan and Disclosure Statement in their entirety.

The Plan's objective is for the Debtors to liquidate all of the Debtors' Assets, including the prosecution of Retained Claims, and distribute the proceeds thereof to holders of Allowed Claims and Allowed Unclassified Claims in satisfaction of the Debtors' obligations.

### 9.2.    Claims and Equity Interests and Treatment under the Plan.

The treatment under the Plan of Allowed Claims and Allowed Interests is in full and complete satisfaction of the legal, contractual, and equitable rights that each Person holding an Allowed Claim or an Allowed Interest may have in or against the Debtors or their property. This treatment supersedes and replaces any agreements or rights those entities have in or against the Debtors or their property. All Distributions under the Plan will be tendered to the Person holding the Allowed Claim or the Allowed Interest. **EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

### 9.3.    Summary of Claims and Interests; Treatment.

The Claims against and Interests in the Debtors and their treatment under the Plan are

summarized below:[5]

        9.3.1   <u>Administrative Expense Claims - Description</u>.  Administrative Claims, generally, are Claims that arise during the pendency of the Chapter 11 case and are entitled to first priority in payment, pursuant to § 507(a)(2) of the Bankruptcy Code.  These include Claims for: (a) costs or expenses of administration of a kind specified in Section 503(b) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving the Bankruptcy Estates incurred on or after the Petition Date and through and including Confirmation; (b) any cure amounts that must be paid in connection with the assumption of executory contracts or unexpired leases of the Debtors under Section 365 of the Bankruptcy Code; (c) fees due to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (d) allowed compensation and costs for professional services under Sections 330 and 331 of the Bankruptcy Code or otherwise.

        9.3.1.1   <u>Administrative Expense Claims – Estimate</u>.  Except for any fees and expenses to Omni Management that may be outstanding as of the Effective Date, the Debtors anticipate that the only Administrative Claims that will remain unpaid as of the Effective Date will be the management fees of DMG and the fees of the Debtors' Professionals.  However, proofs of Claim have been filed alleging $5,573.78 in Administrative Claims.  The additional amounts are subject to verification and are likely to be reduced following resolution of Disputed Claims.  A summary of outstanding professional fees and expenses incurred from the Petition Date through June 30, 2008, net of retainers,[6] is provided below.

| Administrative Claimant | Fees & Expenses incurred through 06/30/08 |
|---|---|
| **Murray & Murray**<br>(Debtors' Bankruptcy Counsel) ............................. $ | 598,005.06 |
| **Buchalter Nemer**<br>(Debtors' Special Regulatory Counsel) ................. $ | 17,721.15 |

---

[5] The information contained herein regarding the Debtors' estimates of Allowable Claims as well as the information regarding filed Claims, as set forth herein, was compiled from information provided to the Debtors by the Claims Agent.  The Debtors have not had the opportunity to verify the accuracy of the information contained in Article IX and all Claims are subject to investigation, verification and objection by the Debtors, the Liquidating Debtor and the Responsible Person.

[6] As of the Petition Date, the retainers held by DMG and the Debtors' professionals were as follows:  DMG ($375,617.78); Murray & Murray ($147,785.49); Buchalter Nemer ($15,437.50); and Rothstein Kass ($20,000).

| | | | |
|---|---|---|---|
| **Rothstein Kass** (Debtors' Auditors and Tax Advisors).................. | $ | 15,425.49 | |
| **Diablo Management Group** (Management Company) | $ | 189,074.09 | |
| **TOTAL:** ............................................................... | $ | 820,225.79 | |

The estimated management fees and expenses of DMG and the fees and expenses of the Debtors' professionals from and after July 1, 2008 are set forth on the Liquidation Analysis attached hereto as **Exhibit "A"**.

Applications for compensation have been filed with the Court regarding the above fees and expenses which are scheduled for hearing on September 2, 2008. All professional fees are subject to approval of the Bankruptcy Court on a duly noticed application for compensation.

9.3.1.2   Administrative Expense Claims – Treatment.  Except to the extent that the holder of a particular Administrative Claim has agreed to a different treatment of such Claim, each holder of an Allowed Administrative Claim will be paid in cash, in full upon the later of: (a) the Effective Date; (b) if such Claim is initially a Disputed Claim, when it becomes an Allowed Administrative Claim; and (c) if such Claim is incurred after the Petition Date in the ordinary course of the Debtors' business, within such time as payment is due pursuant to the terms giving rise to such Claim or as otherwise authorized by the Bankruptcy Court.

9.3.1.3   Administrative Expense Claims – Deadline for Requests for Payment.  Any request for allowance of an Administrative Claim pursuant to Section 503(a) of the Bankruptcy Code, other than by the Debtors' Professionals, must be filed on or before the "Administrative Claims Bar Date," which is thirty (30) days following the date of the NOTICE OF ENTRY OF THE ORDER OF CONFIRMATION that will be sent to all interested parties when the Plan is confirmed. If the holder of an asserted Administrative Claim does not file and serve a request for payment of such Claim (according to the procedures set forth in the Plan) on or before that date, the holder will be forever barred from asserting such Claim or receiving any payment on account of such Claim.

9.3.1.4   Deadline for Objections.  Any objection to the allowance of an

Administrative Claim (excluding Professional Fee Claims) must be filed no later than sixty (60) days

after the Administrative Claims Bar Date (the "<u>Administrative Claim Objection Deadline</u>"). The

Administrative Claims Objection Deadline may be extended for cause by order of the Bankruptcy

Court. If no objection to the applicable Administrative Claim is filed on or before that date, such

Administrative Claim will be deemed Allowed as of that date.

9.3.2    <u>U.S. Trustee Fees</u>. Quarterly fees owed to the U.S. Trustee will be paid by the

Debtors when due in accordance with applicable law and the Debtors will continue to file reports to

show the calculation of such fees for the Bankruptcy Estate until the Cases are closed under

Bankruptcy Code Section 350.

9.3.3    <u>Tax Claims</u>. Certain Claims by governmental units, primarily tax claims, are

entitled to priority over pre-petition Claims of general unsecured Creditors pursuant to

Section 507(a)(8) of the Bankruptcy Code. Proofs of Claim have been filed alleging $114,529.24 in

Tax Claims. The proofs of Claim are subject to verification and may be reduced after objections are

determined by the Bankruptcy Court.[7] Except to the extent that the holder of a particular Tax Claim

has agreed to a different treatment of such Claim, each holder of an Allowed Tax Claim will receive,

on the Effective Date, a cash payment of the Allowed Amount of such Claim; provided, however,

that no such payment will be made unless all Allowed Claims entitled to priority pursuant to

Section 507(a)(2) through (a)(7) of the Bankruptcy Code are being paid concurrently with such

payment or are otherwise receiving the treatment accorded by the Plan.

9.3.4    <u>Class 1 (Allowed Secured Claims of Landlords)</u>.[8] Class 1 consists of any

Allowed Secured Claim (each of which will be its own subclass under Class 1) of the Debtors'

previous landlords that are currently holding security deposits, if any.[9] Proofs of Claim have been

---

[7] The Liquidation Analysis assumes claims will be reduced by twenty-five percent (25%) after resolution of objections.

[8] Regardless of any Creditor's recovery on account of an asserted Secured Claim during the pendency of these cases, the Debtors will retain any and all rights to contest the validity and priority status of any asserted Secured Claim and any and all rights to seek to avoid and recover any asserted collateral (or the value of such collateral) that was transferred to the respective Creditor of the Secured Claim or liquidated by the Creditor of the Secured Claim on account of an asserted Claim.

[9] A Claim is a Secured Claim only to the extent of the value of the Creditor's interest in the Debtors' interest in the Collateral securing the Claim or the extent of the amount subject to recoupment or setoff, as applicable, as determined by the Bankruptcy Court under section 506(a), 553, and/or 1129(b)(2)(A) of the Bankruptcy Code, as applicable.

filed alleging $38,549.72 in Class 1 Claims. An additional proof of Claim has been filed alleging
$2,425.00 priority claim under Section 507(a)(7). The Debtors' preliminary review of the Claim
indicates that the Claim was misfiled and may be a Class 1 Claim, subject to verification. Thus it is
included herein as a Class 1 Claim bringing the total of Class 1 Claims to $40,974.72. All Claims
are subject to verification and may be reduced after objections are resolved by the Bankruptcy Court.

Except to the extent a Class 1 Creditor agrees to a less favorable treatment, the Plan leaves
Class 1 Creditors' legal, equitable, and contractual rights unaltered, including the retention of any
lien to the extent not avoidable. Any Allowed Claim held by Class 1 Creditors remaining after
giving effect to the foregoing treatment will be treated as part of Class 5 or Class 7, as applicable.
Upon the full payment of Allowed Class 1 Claims, any and all liens or security interests of any
nature whatsoever held by Class 1 Creditors will be deemed discharged.

Class 1 is unimpaired, and the holders of Claims in Class 1 are presumed to have accepted
the Plan.

  9.3.5   <u>Class 2 (Allowed Secured Claims (other than Landlords)</u>.[10] Class 2 consists
of any Allowed Secured Claim (each of which will be its own subclass under Class 2) other than the
Secured Claims in Class 1. Class 2 consists of persons with outstanding UCC-1 filings, substantially
all of which are protective UCC-1 filings.[11] Debtors have scheduled no amounts for Class 2 Claims
however certain proofs of Claim filed allege $3,372,641.16 in Class 2 Claims.[12] The additional
amounts are subject to verification and are likely to be reduced following resolution of Disputed
Claims. To the extent that any such Allowed Secured Claims exist, such Allowed Secured Claims
are not impaired under the Plan, as the Plan leaves their legal, equitable, and contractual rights
unaltered, including their retention of any lien to the extent not avoidable. Any Allowed Claim held

---

[10] Regardless of any Creditor's recovery on account of an asserted Secured Claim during the pendency of these cases, the Debtors shall retain any and all rights to contest the validity and priority status of any asserted Secured claim and any and all rights to seek to avoid and recover any asserted collateral (or the value of such collateral) that was transferred to the respective Creditor of the Secured Claim or liquidated by the Creditor of the Secured Claim on account of an asserted Claim.

[11] A Claim is a Secured Claim only to the extent of the value of the Creditor's interest in the Debtors' interest in the Collateral securing the Claim or the extent of the amount subject to recoupment or setoff, as applicable, as determined by the Bankruptcy Court under section 506(a), 553, and/or 1129(b)(2)(A) of the Bankruptcy Code, as applicable.

[12] One creditor has filed a $15,679.87 secured Tax Claim. Debtors' anticipate that the balance of the claim will be a priority Tax Claim after giving full giving full effect to any tax lien.

by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment will be treated as part of Class 5 or Class 7, as applicable. Upon the full payment of any Allowed Class 2 Claims, any and all liens or security interests of any nature whatsoever held by Class 2 Creditors will be deemed discharged.

Class 2 is unimpaired, and the holders of Claims in Class 2 are presumed to have accepted the Plan.

9.3.6 <u>Classes 3 and 4 (Priority Claims)</u>. Claims by employees and providers of employee benefits incurred 180 days prior to commencement of the Chapter 11 cases are entitled to priority under §§ 507(a)(4) and (5) of the Bankruptcy Code. A preliminary review of the Debtors' books and records indicate $416,361.28 in Class 3 and 4 Claims, excluding Class 8 Claims that were either filed or scheduled as priority claims. The Debtors' books and records indicate no class of claims. However, certain proofs of Claim have been filed in the Cases asserting Priority Claims of approximately $871,293.21. The additional amounts are subject to verification and are likely to be reduced following resolution of Disputed Claims.[13]

(a) Except to the extent that the holder of a particular Allowed Priority Claim entitled to priority under §§ 507(a)(4) and (5) of the Bankruptcy Code has agreed to a different treatment of such Claim, each holder of such an Allowed Priority Claim will be paid on the Effective Date in cash, in full, upon the later of: (a) the Effective Date; or (b) if such Claim is initially a Disputed Claim, when it becomes an Allowed Claim.

(b) Classes 3 and 4 are unimpaired under the Plan and are presumed to have accepted the Plan.

9.3.7 <u>Class 5 (Timely Filed Unsecured Allowed Claims of $10,000 or Less)</u>. The holders of Class 5 Claims include Creditors not provided for or included in any other class and that hold Allowed Unsecured Claims of $10,000 or less, and those Creditors with Allowed Claims

---

[13] Several Creditors have filed proofs of Claim indicating $18,551.37 in priority Claims but failed to specify the level or basis of priority. Debtors believe the claims are unsecured and have included them in their estimates for Classes 5 or 7 as appropriate. Additionally, one creditor has filed a Class 4 Claim for $497,472.00 and the Debtors have not yet determined whether the claim is properly asserted as a Priority Claim in whole or in part. To provide a conservative estimate (with full reservation of the Debtors' rights to dispute the claim), the Liquidation Analysis assumes the claim is allowed as a Priority Claim. Similarly, the Liquidation Analysis includes Class 8 asserted Priority Claims even though such claims may ultimately not be allowed as such.

greater than $10,000 who elect treatment under Class 5 and agree to reduce their Allowed Claim to $10,000. Class 5 Claimants will receive a single cash payment in the amount of 20% of their Allowed Unsecured Claim in payment on the latest of: (a) 30 days after the Effective Date of the Plan; or (b) 20 days after the entry of an Order allowing the Claim if there is a filed objection to the Claim.

A preliminary review of the Debtors' books and records and the filed Claims in these Cases indicate that there are $505,800.71 in Class 5 Claims, excluding Class 8 Claims. All Claims are subject to verification and are likely to be reduced following resolution of Disputed Claims.[14]

9.3.8    Class 6 (Top Hat Claimants).  Class 6 consists of all Claims against CLI by the Top Hat Claimants with respect to the Top Hat Plan. The Debtors' books and records indicate approximately $5,132,614.64 in Class 6 Claims. CLI holds $5,181,880.26 in a segregated bank account with respect to the Top Hat Litigation which includes accrued interest.

The Plan leaves the Class 6 Top Hat Claimants' legal, equitable and contractual rights unaltered. The treatment of the Top Hat Claimants is dependent upon the outcome of the Top Hat Litigation to be determined upon entry of a Final Order in the District Court. If CLI prevails in the Top Hat Litigation pursuant to a Final Order, except as may be otherwise provided by a Final Order, the holders of Allowed Class 6 Claims will hold and be afforded the same treatment as (a) Class 4 Claims, to the extent the Claims are Allowed in part as Priority Claims, and/or (b) Class 7 Claims to share pro rata with other Class 7 Claims. If the Top Hat Claimants prevail in the Top Hat Litigation pursuant to a Final Order, except as may be otherwise provided by a Final Order, the holders of Class 6 Claims will be paid the Top Hat Funds, to the extent of their respective contribution, subject to the Liquidating Debtor withholding and paying applicable federal and state withholding income tax amounts to the appropriate taxing authorities (as required), as agreed by the Top Hat Claimants and the Liquidating Debtor, or if they cannot agree, pursuant to a Final Order by the District Court. Payment in accordance with the treatment described in the preceding sentence will occur upon the latest of: (a) within 15 days after entry of the Final Order; (b) upon determination of the amount of

---

[14] In order to provide a conservative estimate, the Liquidation Analysis assumes that Class 8 Claims will not be subordinated and that $9,124.17 in Class 8 Claims will be treated as Class 5 Claims, even though such claims may ultimately not be allowed as such.

1    contribution by each Top Hat Claimant by a Final Order, if the Top Hat Claimants and the

2    Liquidating Debtor cannot agree; or (c) such other time as may be agreed to by the Top Hat

3    Claimants. If the Debtors prevail in the Top Hat Litigation, the interest earned on the Top Hat Funds

4    will become Available Cash. If the Top Hat Claimants prevail in the Top Hat Litigation and if the

5    Debtors and the Top Hat Claimants cannot otherwise agree, such interest will remain in the existing

6    restricted bank account of the Debtors pending a Final Order. Upon entry of a Final Order on such

7    issue, the interest will become Available Cash or payable to the Top Hat Claimants as determined by

8    such Final Order.

9           9.3.9    Class 7 (Timely Filed Unsecured Claims Greater Than $10,000). Class 7

10    consists of all Allowed Timely Filed Unsecured Claims not included or provided for in any other

11    class, including, without limitation, all Rejection Claims and all unsecured Claims of vendors and

12    trade Creditors for goods delivered or services provided to the Debtors prior to the Petition Date, but

13    excluding Administrative Claims, Priority Claims, and Tax Claims. A preliminary review of the

14    Debtors' books and records and the filed Claims in these cases indicates there are $75,767,652.24 in

15    Class 7 Claims. This total is exclusive of (a) any Class 6 Claims which may become Class 7 Claims

16    pursuant to the Plan based on the outcome of the Top Hat Litigation, (b) any Class 8 Claims which

17    may become Class 7 Claims as provided by the Plan; (c) Rejection Claims which may be asserted

18    following Confirmation as a result of the Debtors' rejection of executory contracts and unexpired

19    leases as contemplated by the Plan; and (d) inter-company Claims which are extinguished upon the

20    substantive consolidation of the Bankruptcy Estates. All Claims are subject to verification and are

21    likely to be reduced following resolution of Disputed Claims, including mitigation and offset as

22    applicable.

23        Subject to payment of the Classes 1-5 Allowed Claims as provided by the Plan, each holder

24    of an Allowed Class 7 Claim will receive its Pro Rata share of Available Cash pursuant to one or

25    more Distributions. The Disbursing Agent will make the first distribution on account of Allowed

26    Claims in Class 7 as soon as reasonably practicable, but in no event prior to the Administrative

27    Claims Bar Date or the Rejection Claims Bar Date. Additional Distributions will be made at the

28    Disbursing Agent's discretion.

9.3.10  <u>Class 8 (Insider Unsecured Claims)</u>.  Class 8 consists of Allowed Unsecured Claims by Insiders but excluding the Top Hat Claimants. A preliminary review of the Debtors' books and records and the filed Claims in these Cases indicates that there are $3,272,757.16 in Claims that will be included in Class 8.  Said amount does not include contingent unliquidated indemnity Claims.

The holders of Class 8 Claims will receive the following treatment except as may otherwise be ordered by the Bankruptcy Court:  (a) to the extent that Claims in Class 8 are subordinated under Section 510(c) of the Bankruptcy Code as determined by order of the Bankruptcy Court, such Claims will be subordinate to all classes other than Class 10 and will receive nothing under the Plan; (b) to the extent any Class 8 Claims are disallowed upon objection by the Debtors pursuant to 502(e)(1) or otherwise as determined by order of the Bankruptcy Court, such Claims will receive nothing under the Plan; and (c) any Class 8 Claims allowed and not subordinated will hold and receive the treatment of a Class 3 or Class 4 Claim, to the extent entitled to priority under the Bankruptcy Code, or otherwise shall share Pro Rata in Class 5 or Class 7 as applicable.

9.3.11  <u>Class 9 (Late Filed Claims)</u>.  Class 9 consists of all Allowed Late Filed Claims. Each holder of an Allowed Class 9 Late Filed Claim will receive its Pro Rata share of all Available Cash remaining after payment in full of Allowed Claims in Classes 1 through 7, and Allowed Class 8 Claims not equitably subordinated.  Debtors estimate that it is unlikely that there will be sufficient funds to make any Distribution to the holders of Class 9 Claims.

9.3.12  <u>Class 10 (Interests)</u>.  Class 10 consists of all Interests.  Holders of Class 10 Interest will receive nothing under the Plan on account of such Interests and their respective Interests will be canceled and extinguished on the Effective Date.

There are approximately 2.1 million shares of outstanding CLI common stock, all held by Mr. Fry.  There are approximately 1 million shares of common stock of LES outstanding.  CLI is the sole shareholder of LES.

**9.4.**  **Implementation of the Plan of Reorganization.**

9.4.1  <u>Financial Information</u>.  Attached hereto as **Exhibits "B" and "C"** are the Monthly Operating Reports (July 2008), including Balance Sheets and Exhibits, of CLI and LES,

respectively, which provide financial information as of July 31, 2008. The Debtors will continue to file monthly operating reports with the Bankruptcy Court through the Effective Date of the Plan, and thereafter, the Debtors will file quarterly reports with the Bankruptcy Court pursuant to the Plan. These reports may be examined at the Clerk's Office of the Bankruptcy Court.

9.4.2   Assets. The Liquidation Analysis attached hereto as **Exhibit "A"** describes the remaining assets and their estimated values as presently calculated. Litigation recoveries have not yet been fully quantified as further investigation is required to evaluate these possible claims and their potential value.

9.4.3   Disposition of Remaining Assets. Subject to Bankruptcy Court approval where required, the Liquidating Debtor will liquidate all of its assets remaining as of the Effective Date unless the Responsible Person determines that any such asset is of inconsequential value or that the cost of liquidating such asset would exceed the expected amount of proceeds.

9.4.4   Prosecution of Retained Claims. Except as otherwise provided in the Plan, the Responsible Person will collect and prosecute the Retained Claims. The Responsible Person will not compromise any Retained Claim without first obtaining an order of the Bankruptcy Court, after notice to all Notice Parties and a reasonable opportunity for a hearing, to the extent required under Bankruptcy Rule 9019.

**9.5.    Distributions.**

9.5.1   Distribution Account. If the Disbursing Agent is a Person other than the Responsible Person, the Disbursing Agent will hold any funds transmitted to it in a segregated trust account for the benefit of holders of Allowed Claims.

9.5.2   Timing of Distributions. Except as otherwise provided for in the Plan, the Disbursing Agent will make a first Distribution to holders of Allowed Claims as soon as practicable after the Effective Date. Thereafter, the Disbursing Agent will make subsequent Distributions in its discretion.

9.5.3   Distribution Addresses. Unless a Creditor has provided the Liquidating Debtor with written notice of a different address, Distributions will be sent to Creditors at the address set forth in the proofs of Claim filed with the Bankruptcy Court. If no proof of Claim is

DAK JLF
K:\Atkins\Gelding Pld Plan\Amds 22108) Disclosure1.doc    29  AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR
Case K:\Atkins\Gelding Pld Plan\Amds 22108) Disclosure1.doc    Entered DEBX DATED AUG 05 22, 2008age 36 of
Case 2:05-bk-50030    Doc# 186    Filed 08/22/08    Entered 08/22/08    Page 36 of
70

filed with respect to a particular Claim, the Distribution will be mailed to the address set forth in the Schedules filed by the Debtors.

9.5.4   Withholding Taxes.  Pursuant to Section 346(h) of the Bankruptcy Code, the Disbursing Agent will be entitled to deduct any federal, state or local withholding taxes from any cash payments made with respect to Allowed Claims, as appropriate.  The Disbursing Agent will be permitted to withhold a Distribution to any Creditor that has not provided information requested by the Disbursing Agent for the purpose of fulfilling its obligations hereunder.  The Disbursing Agent will comply with all reporting obligations imposed on it by any governmental unit with respect to withholding and related taxes.

**9.6.    Substantive Consolidation.**

**Upon the Effective Date, the Bankruptcy Estates of CLI and LES will be deemed substantively consolidated for purposes of administration, liquidation of assets, as well as Distribution to Creditors under the Plan.  Substantive consolidation of the CLI and LES cases is appropriate because CLI and LES share many of the same Creditors (and those that are held only by LES are nominal relative to the Claims asserted against CLI), CLI is the largest creditor of LES and its sole shareholder, and the Debtors do not estimate any material adverse change in the distribution to any Creditors as a result of the substantive consolidation.  As a result of the substantive consolidation of the two Bankruptcy Estates, the assets of CLI and LES will be combined and the Allowed Claims of their Creditors will likewise be combined. Any inter-company Claims between CLI and LES will be extinguished as of the Effective Date. As of the date of this Disclosure Statement, CLI believes it holds a Claim against LES in the amount of $1,264,379.44.  There are no known Claims by LES against CLI.**

**9.7.    Responsible Person.**

DMG shall be the Responsible Person under the Plan.  The terms of employment of DMG are and shall be as set forth in the DMG Management Services Agreement subject to approval of its compensation pursuant to Section 9.18 below.  Unless ordered by the Bankruptcy Court, the Responsible Person will serve without a guaranty or fiduciary bond.

The Responsible Person may be replaced in the event of either a voluntary resignation or at

the request of a party in interest for "cause" upon Order of the Bankruptcy Court. In the event of a voluntary resignation, the then-Responsible Person will select a replacement. In the event the Responsible Person is removed for cause, the Court will appoint a replacement.

The Responsible Person will manage the Liquidating Debtor and will have all of the authority to act on behalf of the Liquidating Debtor as if the Responsible Person was the sole shareholder, director and officer in accordance with the Bankruptcy Code, the Bankruptcy Rules and Local Rules. Such management will include: (a) fulfilling the duties and obligations of the Liquidating Debtor under the Plan; and (b) fully administering the Bankruptcy Estate as required by the Plan, the Order of Confirmation, the Bankruptcy Code and the Bankruptcy Rules, which duties and obligations include, without limitation, the facilitation of Distributions pursuant to the Plan, reviewing Claims, objecting to Disputed Claims, supervising the preparation and filing of required tax returns of the Debtors, dissolving the Debtors' corporate existence and closing the Bankruptcy Case. Without limiting the foregoing, the Responsible Person, acting on behalf of the Liquidating Debtor, will have all of the rights and powers of an estate representative appointed pursuant to Section 1123(b)(3) of the Bankruptcy Code to prosecute or otherwise assert the Retained Claims, including any Avoidance Actions. The Responsible Person may resign at any time, or may be removed for cause upon motion by any party in interest to the Bankruptcy Court; provided that any such resignation or removal shall not be effective until a new Responsible Person has been appointed by the Bankruptcy Court.

The Responsible Person may, in its discretion, employ such other persons as may be necessary to assist with implementing the Plan and otherwise as necessary in these Cases.

### 9.8. Current Management and Consultants.

9.8.1 DMG. The Debtors are managed by DMG. Certain consultants and officers of DMG are appointed as officers and/or directors of the Debtors prior to the Petition Date and have continued such roles during the Bankruptcy Cases. The Debtors contemplate that each of the following persons will be employed or retained as consultants through their engagement by DMG to

DAK JLF
K: Corp Liqu. Inc.\Chilling Plcy\Plan_Amd(8-22-08) Disc State2-1.doc
31   AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR
JOINT PLAN (FILED AUGUST 22, 2008)

Case: 08-50030   Doc#: 180   Filed: 08/22/08   Entered: 08/22/08 14:28:47   Page 38 of 70

the Liquidating Debtor after the Effective Date:[15]

9.8.1.1 <u>Richard G. Couch</u>. Mr. Couch has served as CLI's Chief Executive Officer since October 25, 2007 and LES's Chief Executive Officer since December 6, 2007. Mr. Couch is the current Court-appointed Responsible Individual in the Bankruptcy Cases. Since September 1986, Mr. Couch has been the Founder, Chairman of the Board, CEO and Managing Principal of DMG. Through DMG, Mr. Couch has served in various interim executive and/or advisory capacities in companies experiencing managerial, merger/acquisition, financial and/or operational difficulties; managing over 450 company assignments since DMG's inception. In addition, Mr. Couch has handled numerous assignments as a Chapter 11 and Chapter 7 Bankruptcy Trustee, and as Trustees / Assignees in Assignments-for-the-benefit-of-Creditors. Before founding DMG in 1986, Mr. Couch founded and managed RGC Associates, which operated troubled companies usually in an interim President/CEO capacity. Mr. Couch was also a Senior Vice President and Principal with INCO Venture Capital Management assisting in the selection, growth and transition of early-stage companies. Prior to that Mr Couch worked at Xerox Corporation in a variety of Executive Management roles - the most recent of which was as the Vice-President and Chief Staff Officer for the Printing Systems Group. Mr. Couch received a Bachelor of Arts degree in Social Science from the University of Buffalo, a Master of Science degree in Industrial Psychology from the University of Rochester and a Master of Business Administration degree in Finance and Economics from Simon Graduate School of Business at the University of Rochester. Mr. Couch has chaired several graduate level university committees on finance, curriculum, and post-grad placement; has been a guest lecturer for numerous graduate level management programs, and an industry spokesperson in a wide range of business conferences and various media. He has received numerous academic and educational awards and distinctions, including board memberships, and Distinguished Alumni Awards;

9.8.1.2 <u>Sanford A. Knapp</u>. Mr. Knapp has served as CLI's Assistant Secretary since November 20, 2007 and LES's Assistant Secretary since December 6, 2007. Mr.

---

[15] From time to time, there have been and may be additional persons engaged as consultants by DMG on Debtors' behalf who will have a more limited role in the Debtors' liquidation and who are not identified herein.

Case: 08-50006g Pt Doc#11(388) DFiled: 08/22/08    Entered: 08/22/08 14:08:17.  Page 39 of
70

1    Knapp is a DMG consultant with over twenty years of business management, consulting, and

2    entrepreneurial experience. At DMG, Mr. Knapp has contributed to numerous distressed company

3    engagements in the capacity of project lead, interim manager, board director and consultant. His

4    projects and tasks have included: company asset and intellectual property sales; balance sheet and

5    financial restructuring; constituency (shareholder, creditor, customer and employee) management;

6    transaction negotiations and documentation; communications management and support; bankruptcy

7    process management; foreign subsidiary management and closure; litigation management and

8    support; operations and human resources management; distressed financing support; as well as a

9    variety of other fiduciary, legal, corporate and administrative matters. Before joining DMG, Mr.

10    Knapp worked with The York Group International, Double Impact Venture Catalyst, and his own

11    consulting company. Prior to that, he was the Director of Operations, as well as a partner and

12    manager of the Diversity product line at Microquest Corporation. Mr. Knapp is also the founder of

13    eCubator International, a business/product incubator and accelerator, and Monetizor Corporation, a

14    firm that provides a niche consulting service for corporations and organizations, helping them locate

15    and recover lost and escheated assets. Mr. Knapp attended the University of Western Ontario

16    ("UWO") in Canada on an academic scholarship, where his undergraduate studies concentrated on

17    finance and economics. He received his law degree from UWO's School of Law and is a member of

18    the bar of Ontario, Canada;

19           9.8.1.3   Michael J. Cronin. Mr. Cronin has worked as a Senior Consultant

20    with the Diablo Management Group since 1998. Having worked on nearly 30 DMG projects, Mr.

21    Cronin's roles have included: Project Manager on numerous corporate wind-downs and liquidations;

22    Cash Manager positions for distressed companies and deal-related escrow accounts; Consultant to

23    the Trustee of both Bankruptcies and Assignments for the Benefit of Creditors; Liquidation Adviser

24    to Comdisco during it bankruptcy process; and Director of DMG client subsidiaries. Mr. Cronin's

25    project responsibilities have included, but are not limited to: the complete wind-down and

26    liquidation of corporations and their international subsidiaries; satisfaction of Director-related

27    obligations faced by insolvent companies; preservation of corporate asset value; sale and transfer of

28    intellectual property and fixed assets; addressing of all short- and long-term employee-related issues

and the closure of all employee benefit programs including 401(k) plans; negotiations with creditors; preparation or overseeing of all corporate tax filings; and handling of communications between companies and their investors and shareholders. The scope of Mr. Cronin's industry experience is widespread, from high-tech manufacturers, online service-providers, and software companies to event-planning start-ups and Grocery chains. In 1988, Mr. Cronin earned a Bachelor of Science in Managerial Economics from the University of California, Davis. His professional career began with Andersen Consulting (now Accenture), where he spent four years designing and implementing management information systems for a diverse client base of Fortune 500 Companies. He has also worked for the Oakland A's and Senator Pete Wilson; and,

9.8.1.4 <u>Gerard F. Keena II</u>. Mr. Keena began working with Diablo Management Group in 2001. Mr. Keena has extensive international experience in both turnarounds and crisis management situations. He brings to each assignment a broad range of skills including expertise in operations, process improvement and negotiations. He has worked in a wide variety of industries including software, aerospace, and automotive manufacturing. Mr. Keena has held numerous interim management assignments which included operationally distressed businesses in the US, Japan and China. Mr. Keena began his career at Chase Manhattan Bank as a credit analyst and received an MBA from the University of Rochester Simon School of Business and a Bachelor of Arts from Hamilton College.

9.8.2 <u>Non-DMG Consultants</u>. Certain former employees and/or Insiders of the Debtors have provided services to the Debtors during the Bankruptcy Cases on a consulting basis. **Exhibit "D"** attached hereto provides a list of such persons and their former titles with the Debtors.

**9.9. <u>Disbursing Agent</u>.**

DMG will serve as Disbursing Agent unless otherwise ordered by the Court.

**9.10. <u>De Minimis Distributions</u>.**

Notwithstanding any other provision of the Plan, Distributions of less than $50.00 need not be made on account of any Allowed Claim; provided that Distributions that would otherwise be made but for this provision will carry over until the next Distribution Date until the cumulative amount to which any holder of an Allowed Claim is entitled to is more than $50.00, at which time

the cumulative amount of such Distributions will be paid to such holder.

**9.11.  Unclaimed Distributions.**

Any cash Distributions that remain unclaimed or unnegotiated for ninety (90) days following Distribution or are returned for reasons other than the absence of a current or correct address (unless a current or correct address cannot be determined after reasonable inquiry) will become the property of the Liquidating Debtor and be considered Available Cash.

**9.12.  Tax Returns, Payments and Refunds.**

The Liquidating Debtor will file or cause to be filed any and all delinquent and final tax returns and pay any and all taxes owed by the Debtors and the Liquidating Debtor on a timely basis (other than Tax Claims provided for under the Plan). The Debtors believe that one or both of the Debtors may be now entitled to or the Liquidating Debtor will be entitled to various tax refunds. In particular the Internal Revenue Service has verbally indicated that LES is entitled to a tax refund for the fourth quarter of 2007 in the approximate amount of $8,000.00. The Debtors are currently investigating various other potential refunds and the Responsible Person will continue to investigate and pursue all potential tax refunds. The Plan reserves all rights to amend prior tax returns of the Debtors and to pursue and collect all potential tax refunds, to claim losses and to take such other actions to the fullest extent allowed by law to recover value for Creditors.

**9.13.  Termination of Employee Benefit Plans.**

The Liquidating Debtor will continue to fulfill all responsibilities relative to the termination of its employee benefit plans and the distributions therefrom, and will pay the costs related thereto.

**9.14.  Cancellation of Legal Entity.**

Pursuant to the provisions of California Corporations Code, the Debtors and the Liquidating Debtor will be dissolved and their respective corporate existences terminated, without further corporate action, upon the entry of a final decree in the Bankruptcy Case pursuant to Rule 3022 of the Federal Rules of Bankruptcy Procedure. The Order of Confirmation will be deemed the appropriate authorization required under the California Corporations Code, authorizing the Responsible Person to file the requisite certificate of dissolution and certificate of cancellation with the California Secretary of State together with any other filings that may be necessary to cancel and

dissolve the Liquidating Debtor.

**9.15. Further Orders.**

Upon motion by Debtors, on not less than twenty (20) days' notice to the Notice Parties, the Bankruptcy Court may enter such other and further orders as may be necessary or appropriate to facilitate consummation of the Plan.

**9.16. Insurance Policies.**

To the extent any insurance policies exist in which either the Debtors and/or their personnel/consultants have an insurable or other interest in or right to make a claim, such policies will remain available, before and after the Effective Date, to satisfy any and all Claims held by, or asserted against, the Debtors and/or the Debtors' current or former management or other personnel that may be covered by such policies. CLI attempted to but was unable to obtain tail coverage on its pre-petition Errors and Omissions insurance and Debtors are currently investigating all potential claims relating thereto and reserve all rights in respect thereof, including against the insurance carrier, provider and affiliates as well as all claims against persons that may have been or are responsible for any claims that are, could have been or may be available under the Errors and Omission Insurance policy or tail thereto.

**9.17. Post-Confirmation Employment of Personnel.**

The Responsible Person and any Disbursing Agent will be entitled to receive reasonable compensation pursuant to the terms of the Management Services Agreement. The procedure for payment of such compensation is described in Section 9.18 below. The Management Services Agreement provides that DMG may charge for its services at the hourly rate of its consultants, or alternatively, at a flat monthly rate based on the amount charged by each consultant. The applicable hourly rate and flat monthly rate by consultant as charged in this case are as follows:

|          |            |    |                |
|----------|------------|----|----------------|
| R. Couch | $400/hr    | or | $35,000/month  |
| M. Cronin| $150/hr    | or | $15,000/month  |
| M. Couch | $100/hr    |    |                |
| S. Knapp | $175/hr    | or | $25,000/month  |
| G. Keena | $125/hr    | or | $13,500/month  |

Additional consultants may also be retained as needed in the cases.

The alternative billing structure is common to DMG's business practice as typically a

1  significant effort is required early in a case and therefore a flat rate is typically more advantageous to

2  the client and as activity decreases, the arrangement is converted to an hourly arrangement.  Mr.

3  Couch will continue to monitor the actual time expended by DMG's consultants and at such time as

4  an hourly approach for a particular consultant would be more favorable to the bankruptcy estate than

5  a flat rate, that consultant's arrangement will be changed accordingly.  Regardless of whether the

6  compensation is calculated on a flat rate or an hourly rate, the consultants are each maintaining time

7  records and DMG will seek approval of all post-petition compensation pursuant to duly noticed

8  applications for compensation.[16]

9       The Liquidating Debtor and any Disbursing Agent may employ or contract with persons and

10  other entities to perform, or to advise and assist in the performance of, their respective obligations

11  under the Plan.  The Liquidating Debtor may continue to employ the Debtors' Professionals for the

12  purposes for which they were employed before the Confirmation Date, and for such additional

13  purposes as the Responsible Person may request and the Liquidating Debtor may employ other

14  professionals as necessary to perform their responsibilities under the Plan.  The Debtors'

15  Professionals are compensated at their applicable hourly rates as disclosed in their employment

16  application filed with (and approved by) the Bankruptcy Court.

17       **9.18.   Post-Confirmation Compensation and Reimbursement of Professionals.**

18       All professionals employed by the Liquidating Debtor after the Confirmation Date will be

19  entitled to payment of their reasonable post-Confirmation Date fees and reimbursement of expenses

20  on a monthly basis, subject to the following:

21       Each party requesting payment of such compensation will serve a detailed statement of

22  requested fees and expenses on the Notice Parties.

23       Any Notice Party or other party in interest may object to any portion of the requested fees

24       [16] The Management Services Agreement provided for an initial "evergreen" retainer of $50,000 (the

25  "Advance") to be used to pay DMG's final invoice(s).  The CLI Board authorized an initial $75,000 Advance at the
October 25, 2007 board meeting.  As the scope of the pre-petition engagement developed and in order to assign

26  appropriate DMG resources to the matter, the retainer was further increased.  The Management Services Agreement
provides that "the Advance amount will increase substantially should a bankruptcy filing be necessary."  In late

27  December and early January when it became clear that the Chapter 11 filings were necessary, the Advance was further
increased.  As of the Petition Date, DMG held an Advance in the amount of $375,617.78.  Pursuant to its request for

28  approval of its administrative claim scheduled for hearing on September 2, 2008, DMG requests authority to apply the
Advance to its management fees incurred through June 30, 2008.

Case: 08-50030   Doc#: 188   Filed: 08/22/08   Entered: 08/22/08 14:28:17   Page 44 of
70

and expenses.  Any objection to the payment of fees or reimbursement of expenses will be in writing (and sufficiently detailed to allow the party whose compensation is subject to the objection an opportunity to respond, and ultimately to allow the Bankruptcy Court to rule on such objection) and served on the Notice Parties and the party whose compensation is subject to the objection.  Such an objection must be served within twenty (20) days after service of the detailed statement.

If there is no objection to a party's requested fees and expenses within such twenty (20) day period, the Liquidating Debtor will promptly pay the requested amount in full.  If an objection to a portion of the fees or expenses requested is timely served, the Liquidating Debtor will promptly pay the undisputed portion of such fees and expenses.

To the extent that an objection is timely served, the Responsible Person will reserve monies in the amount of the disputed fees and expenses pending resolution of said objection.

Any objection to a request will be resolved by either (a) written agreement between the party requesting such fees and expenses and the objecting party, or (b) resolution of the disputed amount by the Bankruptcy Court pursuant to a Final Order.  Resolution by the Bankruptcy Court will be requested by motion filed and served on the Notice Parties in accordance with the Bankruptcy Rules and the Local Rules on not less than twenty (20) days notice and such motion may be filed by either the requesting party or the objecting party.  Any opposition to the motion will be filed and served no later than five (5) days prior to the hearing.

All payments made pursuant to the foregoing procedure will be interim only and subject to final Bankruptcy Court approval on a duly noticed application for compensation.

**9.19.  Post Confirmation Notice.**

To the extent any action taken in the Bankruptcy Case after the Effective Date requires notice under the Bankruptcy Code or the Bankruptcy Rules, the Order Limiting Notice entered in the Bankruptcy Case will continue in effect and notice will be provided in accordance therewith, provided that notice will not be required to any Person whose Claims have been paid in full.  The Liquidating Debtor and the Responsible Person may proceed via the "scream or die" notice procedures as permitted by the Local Rules.

/ / /

DAK JLF
K: Corp\USO\Draffing Pldgs\Plan\Disc Stmt(Amd(8-22)08) DS Amnd.doc
38  AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN DATED AUGUST 22, 2008

Case: 08-50050    Doc# 186    Filed: 08/22/08    Entered: 08/22/08 14:25:17    Page 45 of 70

**9.20. Post-Confirmation Reports, Fees, and Final Decree.**

9.20.1 U.S. Trustee Fees. Not later than thirty (30) days after the end of each calendar quarter that ends after the Effective Date (including any fraction thereof), the Liquidating Debtor will pay to the United States Trustee the quarterly fee for such quarter until this case is converted, dismissed, or closed pursuant to a Final Decree, as required by 28 U.S.C. § 1930(a)(6).

9.20.2 Post-Confirmation Reports. Not later than thirty (30) days after the end of each calendar quarter which ends after the Effective Date, the Liquidating Debtor will file and serve upon the United States Trustee a quarterly post-Confirmation status report in substantially the form provided by the United States Trustee. Further reports will be filed thirty (30) days after the end of every calendar quarter thereafter until entry of a Final Decree, unless otherwise ordered by the Bankruptcy Court.

9.20.3 Final Decree. After the Bankruptcy Estate is fully administered, the Liquidating Debtor will file an application for a Final Decree, and will serve the application on the Notice Parties providing at least twenty (20) days' notice of the request for entry of the Final Decree.

## ARTICLE X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**10.1. Treatment of Executory Contracts and Unexpired Leases.**

The Debtors reserve the right to move the Bankruptcy Court at any time for authority to assume, assume and assign, or reject, pursuant to Bankruptcy Code Section 365, any and all contracts that are executory and leases that are unexpired.

**10.2. Assumption of Executory Contracts and Unexpired Leases.**

Each contract listed on **Exhibit "A"** to the Plan will be deemed assumed by the Debtors on the Effective Date to the extent each such contract is an executory contract.

**10.3. Effect of Assumption of Executory Contracts and Unexpired Leases.**

All executory contracts assumed prior to Confirmation or pursuant to the Plan and not otherwise rejected pursuant to the Plan will remain in full force and effect, be unimpaired by the Plan except as specifically modified by the Plan and the Order of Confirmation, and be binding on the parties thereto.

**10.4. Adding and Removing Executory Contracts and Unexpired Leases.**

The provisions of Article VII of the Plan may be amended, with appropriate notice to those parties in interest directly affected, at any time prior to the conclusion of the hearing on Confirmation of the Plan, to add or remove executory contracts and unexpired leases to be assumed, assumed and assigned, or rejected pursuant to the Plan.

**10.5. Defaults.**

Unless other treatment is agreed to between the parties to each assumed contract or lease, if there has been a default in an assumed executory contract or unexpired lease other than the kind specified in Section 365(b)(2) of the Bankruptcy Code, the Debtors shall, on or before the Effective Date: (a) cure, or provide adequate assurance that they will promptly cure, any such default; (b) compensate, or provide adequate assurance that they will promptly compensate, the other party to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (c) provide adequate assurance of future performance under such contract or lease.

**10.6. Rejection of Executory Contracts and Unexpired Leases.**

Without admitting the validity of any other executory contracts and unexpired leases, all executory contracts and unexpired leases of the Debtors that are listed on **Exhibit "B"** to the Plan will be deemed rejected by the Debtors as of the Effective Date. Confirmation of the Plan will be deemed to constitute Bankruptcy Court approval of such rejection.

**10.7. Rejection Claims.**

The holder of a Rejection Claim is required to file with the Bankruptcy Court, and serve on counsel for the Liquidating Debtor, a proof of Claim relative to such Rejection Claim on or before the Rejection Claims Bar Date or be forever barred from asserting any such Claim or receiving any payment or other Distribution on account of such Claim.

**ARTICLE XI.**

**PROOFS OF CLAIM; OBJECTIONS**

**11.1. Time for Filing Proofs of Claim.**

Proofs of Claim, when required, had to be filed with the Bankruptcy Court no later than the applicable Claims Bar Date (which for most prepetition Claims was May 6, 2008 and for

DAK JLF
K:\Couch\Liquidating Plan\Amd 2 (8-22-08) Disclosure.doc

40 AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR
JOINT PLAN DATED AUGUST 22, 2008

Case 2:08-bk-50030 Doc#186 Filed 08/22/08 Entered 08/22/08 Page 47 of 70

governmental units was July 2, 2008). However, Bankruptcy Rule 3003(b) provides that it is not necessary for a Creditor to file a proof of Claim if its Claim has been listed on the Debtors' Schedules filed with the Bankruptcy Court pursuant to Section 521(a)(1) of the Bankruptcy Code and Rule 1007(a)(3) of the Bankruptcy Rules, and is not listed as disputed, contingent, unliquidated or unknown as to amount.

### 11.2. Ownership and Transfers of Claims.

Distributions to Creditors under the Plan will be made to the Persons shown on the Debtors' or the Bankruptcy Court's records on the first Distribution Date. For purposes of any Distribution under the Plan, the Liquidating Debtor, the Disbursing Agent, the Responsible Person, and their professionals will have no obligation to recognize any transfer of Claims after the first Distribution Date.

> ANY PARTY WHO ACQUIRES A CLAIM AGAINST THE LIQUIDATING DEBTOR AFTER THE FIRST DISTRIBUTION DATE MUST ARRANGE WITH THE HOLDER ON THAT DATE TO RECEIVE DISTRIBUTIONS TO WHICH THE TRANSFEREE MAY BE ENTITLED. NEITHER THE LIQUIDATING DEBTOR NOR THE DISBURSING AGENT WILL BE REQUIRED TO TRACK CHANGES IN OWNERSHIP OF CLAIMS AFTER THE FIRST DISTRIBUTION DATE.

### 11.3. Amendments to Claims.

Except as provided by the Plan or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law, proofs of Claim (a) may not be filed upon expiration of the applicable bar date, and (b) may not be amended later than thirty (30) days following the date of the notice of the Confirmation Date except for amendments to proofs of Claim to decrease the amount or priority thereof; provided that the foregoing deadline will not accord a claimant a right to amend a Claim that, pursuant to applicable law, is not subject to amendment. Unless otherwise provided herein, any new or amended Claim filed after the Confirmation Date will be deemed disallowed in full and expunged without any action by the Liquidating Debtor or Responsible Person.

### 11.4. Claim Objections.

An objection to a Claim will be filed no later than the Claims Objection Date which is ninety (90) days after the Effective Date; provided, however, that such date may be extended by the

DAK JLF
K:\ConUnion Trading Plt\Plan Amd(8-22-08) DISc\Sec\1.doc
41   AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN DATED AUGUST 22, 2008

Case: 08-30030   Doc# 186   Filed: 08/22/08   Entered: 08/22/08 14:26:47   Page 48 of 70

Bankruptcy Court for cause upon the ex parte motion of the Liquidation Debtor.  The Liquidating Debtor will have the primary responsibility to review Claims filed against the Debtors, to file objections as appropriate and to resolve Disputed Claims.

**11.5.   Reserve Accounts.**

11.5.1 <u>Disputed Reserve Account</u>.  Subject to the next sentence, any cash that would be distributed to the holder of a Disputed Claim if it were an Allowed Claim on any Distribution Date hereunder will be set aside by the Disbursing Agent into the Disputed Claims Reserve Account. Not later than fifteen (15) days after the Disbursing Agent receives notice that a Disputed Claim has been Allowed in whole or in part, the Disbursing Agent will Distribute the cash deposited into the Disputed Claims Reserve Account on account of such Disputed Claim.  To the extent that cash payments made into the Disputed Claims Reserve Account on account of a Disputed Claim exceed the cash distributable with respect to the Allowed Amount of such Claim, such excess cash will be considered Available Cash.

11.5.2 <u>Reserve Account for Top Hat Funds</u>.  Unless otherwise ordered by the Bankruptcy Court, the Top Hat Funds will remain in a segregrated, restricted bank account pending a Final Order in the Top Hat Litigation.

**11.6.   Distributions.**

Notwithstanding any provision of the Plan specifying a date or time for payments or Distributions of consideration hereunder, payments and Distributions in respect of any Claim that at such date or time is disputed, unliquidated or contingent, will not be made until a Final Order with respect to an objection, estimation or valuation of such Claim is entered by the Bankruptcy Court, whereupon appropriate Distributions will be made promptly in accordance with the preceding section.

**ARTICLE XII.**

**<u>RESERVATION OF RIGHTS AND PRESERVATION OF CLAIMS</u>**

**12.1.   <u>All Retained Claims are Preserved</u>.**

As discussed above, the Debtors' Bankruptcy Cases are highly complex and involve a multitude of transactions with many different parties.  The Debtors continue to review transactions

and records which process is likely to result in additional claims against persons not yet identified herein and may also result in other claims against persons identified herein in addition to those identified at this point in time. Confirmation of the Plan effects no settlement, compromise, waiver or release of any Retained Claim unless the Plan or Order of Confirmation specifically and unambiguously so provides. The failure of the Plan to refer to any particular Retained Claim is not and will not be construed as a settlement, compromise, waiver, or release of any such Retained Claim. All Retained Claims are hereby preserved and will continue to remain valid after the Effective Date.

Without limiting the generality of the foregoing, the Retained Claims include, but are not limited to, the following: (1) all preliminary Retained Claims as identified on Exhibit "C" to the Plan; and (2) all preliminary Retained Claims as identified in the Debtors' STATEMENT OF FINANCIAL AFFAIRS (as amended or supplemented), excerpts of which are attached to the Plan as Exhibit "D."

**12.2.   Investigation and Prosecution of Retained Claims.**

The Debtors have been investigating or intend to investigate potential Retained Claims, including those against the aforementioned parties. In the event that any Claims are asserted against the Debtors for which Insiders may be partially or fully responsible, the Debtors and Liquidating Debtors reserve all rights to seek recovery against such persons. The entry of the Order of Confirmation will not constitute res judicata or otherwise bar, estop or inhibit any actions by the Liquidating Debtor upon any Retained Claims.

**ARTICLE XIII.**

**RETENTION OF JURISDICTION**

The Plan provides that the Bankruptcy Court will have exclusive jurisdiction of the Bankruptcy Case: (a) to enforce the provisions, purposes, and intent of the Plan; (b) to determine the allowance or disallowance of Claims; (c) to hear and determine proceedings initiated before or after the Confirmation Date and the Effective Date regarding the prosecution of the Retained Claims or any other rights, claims, causes of action or claims for relief held by the Liquidating Debtor against any party, including the recovery of property and subordination of Claims; (d) to fix and approve allowance of compensation and other Administrative Claims, including, if appropriate, payments to

be made in connection with the Plan; (e) to adjudicate controversies arising from the terms of the Plan; (f) to hear and determine any proposed modifications of or amendments to the Plan to the extent permitted by Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019; (g) to enforce or interpret the provisions of the Plan, the Order of Confirmation or any order entered by the Bankruptcy Court in the Bankruptcy Case; (h) to facilitate the consummation of the Plan; (i) to consider such other matters as may be set forth in the Plan or the Order of Confirmation; (j) to hear and determine any Claim of any Persons of any nature whatsoever against the Debtors' professionals arising in or related to the Case; (k) to hear any other matter pertaining to the Plan; and (l) to enter a Final Decree closing the Bankruptcy Case. If closed, the Bankruptcy Case may be reopened at any time to facilitate the provisions of Article XI of the Plan.

## ARTICLE XIV.

## OTHER PLAN PROVISIONS

### 14.1. Exemption from Stamp, Transfer and Other Taxes.

To the extent any sale contemplated by the Plan would be subject to a stamp or similar tax, the Debtors will be entitled to exclusion of such sale from any stamp or similar tax to the fullest extent allowed by law.

### 14.2. Injunctions and Stays.

Unless otherwise provided, all injunctions or stays arising under or entered during the Cases under Section 105 or Section 362 of the Bankruptcy Code, or otherwise, an in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

### 14.3. Revocation of the Plan.

The Debtors reserve the right to withdraw the Plan before the Confirmation Date.

### 14.4. Nonconsenual Confirmation.

In the event that the Classes not entitled to vote fail to accept the Plan in accordance with Bankruptcy Code Section 1129(a)(8), the Debtors reserve the right to modify the Plan in accordance with Bankruptcy Code Section 1127(a). In accordance with Section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or schedule including amending or modifying it to satisfy the requirements of the Bankruptcy

DAK/JLF
K: (PAUL'S OFFICE)\Plan\Plan Amd(8-8-08).DSCleaned.doc
44 AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN OF DAUGUST 22, 2008

Case: 08-50050    Doc #: 186    Filed: 08/22/08    Entered: 08/22/08 14:26:17    Page 51 of 70

Code.

**14.5. <u>Modification</u>.**

The Debtors may propose amendments to or modifications of the Plan under Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the conclusion of the hearing on Confirmation of the Plan. After the Confirmation Date, the Debtors may modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019.

**14.6. <u>Setoff/Recoupment</u>.**

**Nothing contained in the Plan will constitute a waiver or release by the Debtors or Liquidating Debtor of any right of setoff or recoupment the Debtors may have against any Creditor**

**14.7. <u>Reservation of Rights</u>.**

Neither the filing of the Plan nor any statement or provision contained in the Plan or in the Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, will: (a) be or be deemed to be an admission against interest; and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Plan nor the Disclosure Statement nor any statement contained in the Plan or in the Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding or controversy within or without this Bankruptcy Case involving the Debtors, except with respect to Confirmation of the Plan.

**ARTICLE XV.**

**<u>EFFECT OF CONFIRMATION</u>**

As of the Confirmation Date, the effect of the Order of Confirmation will be as provided in Section 1141 of the Bankruptcy Code, and as follows:

**15.1. <u>Binding Effect of Plan</u>.**

The provisions of the confirmed Plan will bind the Debtors, the Liquidating Debtor, any entity acquiring property under or otherwise accepting the benefits of the Plan, and every Creditor

1 and Interest Holder, whether or not such Creditor or Interest Holder has filed a proof of Claim or

2 Interest in the Bankruptcy Case, whether or not the Claim or Interest of such Creditor or Interest

3 Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted

4 or rejected the Plan.

5     **15.2.**   **Revesting**.

6     On the Effective Date, all property of the Debtors and the Bankruptcy Estates will vest in the

7 Liquidating Debtor, free and clear of any and all liens, encumbrances, Claims and Interests of

8 Creditors and Interest Holders except as otherwise provided in the Plan. Revesting does not modify

9 the nature of any contracts assumed by the Debtors.

10     **15.3.**   **Full Satisfaction of Claims**.

11     Except as otherwise provided in the Plan and the Order of Confirmation, the rights afforded

12 in the Plan will constitute full and complete satisfaction and release of all Claims, including any

13 interest accrued thereon from and after the Petition Date, against the Debtors, the Liquidating

14 Debtors, the Bankruptcy Estates, or any assets or property of the Debtors, the Liquidating Debtor

15 and the Bankruptcy Estates.

16     **15.4.**   **Reservation of Powers**.

17     Nothing in the Plan will be deemed to have constituted a waiver of the any powers held by

18 the Debtors as debtors in possession under the Bankruptcy Code, the Bankruptcy Rules or the Local

19 Rules. The Liquidating Debtor will retain all powers granted by the Bankruptcy Code, the

20 Bankruptcy Rules and the Local Rules to a trustee or debtor in possession, including those with

21 respect to recovery of property and objections to, and/or subordination of, Claims and Interests.

22                   **ARTICLE XVI.**

23                   **RISK FACTORS**

24     Holders of impaired Claims entitled to vote on the Plan should read and consider carefully

25 the factors set forth below, as well as other information set forth in this Disclosure Statement and the

26 documents delivered together herewith and/or incorporated by reference herein prior to voting to

27 accept or reject the Plan.

28    ///

**16.1. Additional Claims Risks.**

The Administrative Claims Bar Date and Rejection Claims Bar Date will occur after Confirmation and the Allowed amount of such Claims will increase the overall liabilities of the Liquidating Debtor and therefore the cash available for holders of Claims. Additionally, if the Liquidating Debtor is unsuccessful in its objections to Disputed and contingent Claims that have been filed against the Debtors, the total liabilities will be greater than expected, and there may be less cash available for Distribution to holders of Claims.

**16.2. Estimation of Claims and Distribution Risks.**

While the Debtors have endeavored to project what they believe are likely to be the Distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the Debtors' projections will be accurate, and that Creditors will receive the Distributions described in the Plan. The Debtors' projections will necessarily be affected by, among other things: (1) recoveries by the Debtors on the Retained Claims; (2) recoveries by the Debtors in connection with the liquidation of all other assets; (3) the outcome of objections to Claims; and (4) the cost and expenses of such actions.

**16.3. Bankruptcy Risks.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only is such claim or interest is substantially similar to the other claims or interest of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. The Debtors believe that the Plan satisfies all of the requirements for confirmation of a plan under Section 1129.

**16.4. Investment Risks.**

Some of the Debtors' investments and assets may continue to lose value or may become impaired. The Debtors have investments in a micro security, a mortgage brokerage and a real estate

development. These investments are inherently risky and the Debtors may incur losses related to these investments. The Debtors may be unable to recover the value of those investments and they may ultimately have no value. In addition, CLI owns several REO properties, the value of which may decline given the unstable real estate market.

**16.5. Collection Risks**

Debtors may experience increasing difficulty collecting remaining outstanding accounts receivable. As a result of economic conditions or the impact of the Debtors' Bankruptcy Cases, obligors under the Debtors' accounts receivable may be unable or unwilling to pay the Debtors for products and services provided them and upon which the outstanding accounts receivable have been generated. Debtors have established allowances that they believe are sufficient to cover losses due to bad debts.

**ARTICLE XVII.**

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**17.1. Introduction.**

**THE FOLLOWING IS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN THAT MAY BE MATERIAL TO CREDITORS (EACH A "HOLDER"). THIS DISCUSSION IS INCLUDED FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT INTENDED TO BE, AND IS NOT, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. THIS SUMMARY IS BASED ON THE CURRENT PROVISIONS OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THE INCOME TAX REGULATIONS (THE "REGULATIONS") AND OTHER LEGAL AUTHORITIES, ALL OF WHICH ARE SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. NO RULINGS FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR OPINIONS OF COUNSEL HAVE BEEN OR WILL BE REQUESTED CONCERNING THE MATTERS DISCUSSED BELOW. THE TAX CONSEQUENCES SET FORTH IN THE FOLLOWING DISCUSSION ARE NOT BINDING ON THE IRS OR THE COURTS, AND NO ASSURANCE CAN BE GIVEN THAT CONTRARY POSITIONS WILL NOT BE**

1   SUCCESSFULLY ASSERTED BY THE IRS OR ADOPTED BY A COURT.

2       THIS SUMMARY DOES NOT ADDRESS STATE OR FEDERAL INCOME TAX
3   CONSEQUENCES TO INTEREST HOLDERS.

4       THE FOLLOWING DISCUSSION DOES NOT APPLY TO CERTAIN HOLDERS
5   WHO, DUE TO THEIR PARTICULAR CIRCUMSTANCES, MAY BE SUBJECT TO
6   SPECIAL RULES. THOSE HOLDERS INCLUDE HOLDERS WHO ARE DEALERS IN
7   SECURITIES, FINANCIAL INSTITUTIONS, INSURANCE COMPANIES, TAX-EXEMPT
8   ORGANIZATIONS, OR FOREIGN PERSONS.

9       **17.2.   IRS Circular 230.**

10      TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230,
11  HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX
12  ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE
13  RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE
14  OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE
15  INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN BY
16  DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN
17  THE MEANING OF CIRCULAR 230) BY DEBTORS OF THE TRANSACTIONS OR
18  MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED
19  ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX
20  ADVISOR.

21      EACH HOLDER SHOULD CONSULT THE HOLDER'S OWN TAX ADVISOR TO
22  DETERMINE THE HOLDER'S PARTICULAR U.S. FEDERAL INCOME TAX
23  CONSEQUENCES AND OTHER TAX CONSEQUENCES TO THE HOLDER OF THE
24  PLAN, INCLUDING ANY STATE, LOCAL AND FOREIGN TAX LAWS AND THE
25  EFFECT OF ANY CHANGES IN SUCH LAWS.

26      **17.3.   Consequences to Debtors.**

27      In general, the Code provides that a debtor in a bankruptcy case is not taxable on cancellation
28  of debt ("COD") income, but must release certain of its tax attributes (such as its net operating loss

1  ("NOL") carryforwards and its tax basis in its assets) by the amount of COD income. COD income

2  results when the amount of debt discharged exceeds the consideration given in exchange therefore,

3  and is equal to such excess amount. Notwithstanding the absence of a bankruptcy discharge, it is

4  likely that a cancellation of debt will be deemed to have occurred on the Effective Date. Any

5  reduction in tax attributes does not occur, however until the end of the taxable year or, in the case of

6  asset basis reduction, the first day of the taxable year following the taxable year in which the COD is

7  incurred.

8      **17.4.**   **Consequences to Creditors.**

9      Generally, any amount received by a Creditor in satisfaction of an Allowed Claim, to the

10  extent such amount constitutes "gross income" within the meaning of Section 61 of the Code, will be

11  taxable to the Creditor in accordance with the Creditor's method of accounting, if not previously

12  included in the Creditor's gross income. This would include, for example, payments of interest, rent

13  or compensation for services. If a Creditor previously reported as taxable income, their respective

14  Allowed Claim then the unpaid portion of the previously reported taxable income would be

15  deductible as a business bad debt. A Creditor may be subject to regular income tax withholding or

16  backup withholding, as described below, with respect to such payments. Creditors should consult

17  with their own tax advisors as to the character and timing of recognition of any gain, loss or

18  deduction they are planning to include in their tax return.

19      Any amount received by a Creditor in satisfaction of accrued interest on a Claim will be

20  taxable to the Creditor as interest income, if not previously included in the Creditor's gross income.

21  A Creditor may be subject to backup withholding, as described below, with respect to such interest

22  payments.

23      Each Creditor who receives cash in partial or complete satisfaction of the Creditor's Claim

24  will recognize gain or loss equal to the difference between the amount of cash received and the

25  Creditor's tax basis in the Creditor's Claim. Gain may be recognized, for example, by a Creditor

26  who acquired a Claim at a discount or who previously reported a bad debt deduction or worthless

27  security loss with respect to all or a portion of the Claim. GENERALLY, ANY GAIN

28  RECOGNIZED WILL BE CONSIDERED CAPTIAL GAIN if the Claim is held as a capital asset,

DAK JLF                                                 50   AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR
K:\Goe\Pleading\Pld Disc (amd 1-08) Disc Stmt.doc                    JOINT PLAN (DATED AUGUST 22, 2008)

Case 6:06-bk-15930   Doc#186   Filed 08/22/08   Entered 08/22/08   Page 57 of
70

and GENERALLY will be ordinary income if the Claim is not held as a capital asset. Capital gain will generally be long-term capital gain if the Claim has been held for more than 12 months. Creditors should consult with their own tax advisors as to the character and timing of recognition of ANY gain, loss or deduction THEY ARE PLANNING TO INCLUDE IN THEIR TAX RETURN.

Any loss will GENERALLY be a capital loss if the Claim is a capital asset and if the payment is deemed a "retirement" of the Claim within the meaning of Section 1271 of the Code. A Creditor who receives no payment with respect to a Claim (and a Creditor who receives a payment which is not a "retirement" and incurs a loss) should generally be able to claim a bad debt deduction to the extent of the Creditor's tax basis in the Claim (or, in the case of a Creditor receiving a payment, the excess of the tax basis in the Claim over the payment received). A Creditor who holds a Claim as a nonbusiness bad debt and who is not a corporate Creditor will generally only be able to claim a short-term capital loss with respect to such Claim. A Creditor who holds a Claim which is a "security" as defined in Section 165(g) of the Code will generally only be able to claim a capital loss rather than a bad debt deduction. Limitations apply to the ability to deduct capital losses. Creditors should consult with their own tax advisors as to the character and timing of recognition of ANY gain, loss or deduction THEY ARE PLANNING TO INCLUDE IN THEIR TAX RETURN.

Because a loss is allowed only for the tax year in which it is sustained, a Creditor that claims a loss or deduction in the wrong tax year risks losing the benefit of such loss or deduction in its entirety. Creditors should consult with their own tax advisors as to the character and timing of recognition of ANY gain, loss or deduction THEY ARE PLANNING TO INCLUDE IN THEIR TAX RETURN.

**17.5.  Wage Withholding.**

If any Allowed Claim under the Plan constitutes "wages" for U.S. federal income tax purposes, the U.S. federal income tax rules applicable to wage withholding will apply to the payment of the Allowed Claim.

**17.6.  Backup Withholding.**

U.S. federal income tax laws require that, to avoid backup withholding with respect to "reportable payments" (in an amount equal to 28%). A Creditor or Holder must: (a) provide Debtors

with its correct taxpayer identification number ("TIN") on IRS Form W-9 and certify as to their eligibility for exemption from backup withholding; or (b) establish a basis for exemption from backup withholding on an appropriate IRS Form W-8 (including a Form W-8BEN, W-8ECI, W-8EXP and W-8IMY) or IRS Form W-9, as applicable. Exempt Creditors and Holders (including, among others, all corporations and certain foreign individuals) are not subject to backup withholding and reporting requirements. If withholding is made and results in an overpayment of taxes, a refund may be obtained.

**ARTICLE XVIII.**

**VOTING PROCEDURES**

With the Plan and Disclosure Statement, Creditors entitled to vote on the Plan will receive a Ballot and instructions for voting on the Plan. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot sent to you with this Disclosure Statement and the Plan.

To simplify the voting procedure, Ballots have been sent only to all known holders of Claims, including Disputed Claims to which objections may be filed. Ballots have not been sent to Interest Holders for the reasons set forth in hereinafter. Only holders of Claims allowed under Section 502 of the Bankruptcy Code, or temporarily allowed for voting purposes under Bankruptcy Rule 3018, whose Claims are in those Classes of Claims that are "impaired" (as defined in Section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.

**18.1.** **Definition of Impairment.**

Under Section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization unless, with respect to each claim or equity interest of such class, the plan:

      (1)    leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

      (2)    notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to demand or receive accelerated payment of its claim or interest after the occurrence of a default:

(a)     cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

(b)     reinstates the maturity of such claim or interest as it existed before the default;

(c)     compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or applicable law; and,

(d)     does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or interest.

Classes of Claims that are not impaired are conclusively presumed to have voted to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

A Claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court rules on the objection. The Bankruptcy Court may temporarily allow a Disputed Claim to which an objection has been filed for purposes of voting on the Plan. Therefore, although holders of Disputed Claims to which an objection has been filed will receive Ballots, these votes will not be counted unless the Bankruptcy Court temporarily allows such Claims for purposes of voting on the Plan.

Classes 1, 2, 3, 4 and 6 are not impaired under the Plan and are therefore conclusively presumed to have accepted the Plan. Accordingly, acceptances with respect to Classes 1, 2, 3, 4 and 6 are not being solicited and no Ballots need be returned by Classes 1, 2, 3, 4 and 6 Creditors. Class 9 Creditors and Class 10 Interests will receive nothing under the Plan and are deemed therefore to have rejected the Plan. As a result, the vote of Class 9 Creditors and holders of Class 10 Interests is not being solicited and no Ballots need be returned by Class 9 Creditors or holders of Class 10 Interests. Acceptances of the Plan are therefore being solicited only from Classes 5, 7 and 8 Creditors. Consequently, only Classes 5, 7 and 8 Creditors need to return their Ballots.

The Bankruptcy Court will hold a hearing on the Confirmation of the Plan commencing on the date and at the time and place set forth in the Order Approving Disclosure Statement. The

1  hearing may be adjourned from time to time without notice except as given in open court.

2  If a party in interest is a member of more than one Class, it will receive a Ballot for each

3  class. IF YOU ARE A MEMBER OF MORE THAN ONE CLASS, YOU MUST FILL OUT AND

4  RETURN ALL BALLOTS SENT TO YOU FOR YOUR VOTE TO COUNT IN EACH CLASS.

5  CREDITORS WISHING TO VOTE ON THE PLAN SHOULD COMPLETE THE BALLOT

6  PROVIDED AND RETURN IT NO LATER THAN _____ TO:

7  **Murray & Murray**
   **A Professional Corporation**
8  **Attn: Doris A. Kaelin**
   **19400 Stevens Creek Boulevard, Suite 200**
9  **Cupertino, California 95014-2548**

10  **IF YOUR BALLOT IS NOT RETURNED BY _____, (the "<u>VOTING DEADLINE</u>")**

11  **IT MAY NOT BE CONSIDERED. BALLOTS WHICH ARE RETURNED BUT NOT**

12  **PROPERLY EXECUTED WILL NOT BE CONSIDERED. BALLOTS WHICH ARE**

13  **EXECUTED BUT WHICH FAIL TO INDICATE EITHER ACCEPTANCE OR**

14  **REJECTION OF THE PLAN WILL BE CONSIDERED AS ACCEPTING THE PLAN.**

15  As the holder of a Claim against the Debtors, your acceptance of the Plan is important. In

16  order for the Plan to be accepted by a class of Claims, the holders of two-thirds (2/3) in dollar

17  amount and more than one-half (1/2) in number of the Allowed Claims of such class who vote on the

18  Plan must vote for acceptance. If any class of Claims does not accept the Plan, the Debtors may

19  elect to seek confirmation (i.e., Bankruptcy Court approval) of the Plan under Section 1129(b) of the

20  Bankruptcy Code. Confirmation under Section 1129(b) can, in appropriate circumstances, take

21  place notwithstanding the rejection of, or objection to, the plan by the holders of claims and

22  interests. If required, the Plan may be modified at or prior to the hearing on confirmation to permit

23  Bankruptcy Court approval under Section 1129(b). If the Plan is not confirmed, the Bankruptcy

24  Court may order the Bankruptcy Cases dismissed, or converted to a case under Chapter 7 of the

25  Bankruptcy Code, or the Debtors or other parties in interest may propose a different plan.

26  After carefully reviewing the Plan and Disclosure Statement, indicate your vote on the

27  enclosed Ballot and return it in the envelope provided to the address stated above. Votes cannot be

28  transmitted orally or by email. Accordingly, you are urged to return your signed and completed

Ballot promptly. Ballots not received by the Voting Deadline and unsigned Ballots will not be counted. Any executed Ballots that are timely received, but which do not indicate either an acceptance or rejection of the Plan, will be deemed to constitute an acceptance of the plan.

If you are a holder of a Claim in Classes 5, 7 or 8 and: (a) did not receive a Ballot; (b) received a damaged or illegible Ballot; or (c) lost your Ballot, or if you are a party in interest and have any questions concerning the Disclosure Statement, any of the Exhibits hereto, the Plan, or the voting procedures in respect thereof, please contact Murray & Murray, A Professional Corporation, Attn: Doris A. Kaelin, 19400 Stevens Creek Blvd, Suite 200 Cupertino, California 95014; Telephone (408) 907-9200; email dkaelin@murraylaw.com.

THE DEBTORS, AS PROPONENTS OF THE PLAN, RECOMMEND THAT THE HOLDERS OF CLAIMS IN CLASSES 5, 7 AND 8 VOTE TO ACCEPT THE PLAN.

A summary of the treatment of the various classes of Claims and Interests is set forth above.

## ARTICLE XIX.

## CONFIRMATION PROCEDURES; OBJECTIONS TO CONFIRMATION

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### 19.1. Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any postponement thereof. Section 1128(b) provides that any party in interest may object to confirmation of the Plan. Any objection to confirmation must be made in writing and filed with the Bankruptcy Court and served on the following parties, together with a certificate of service:

> Doris A. Kaelin
> Murray & Murray
> A Professional Corporation
> 19400 Stevens Creek Boulevard, Ste. 200
> Cupertino, CA 950144
> Fax: (650) 852-9244

/ / /

United States Trustee
John Wesolowski
280 South First Street, Room 268
San Jose, California 95113
Fax No. (408) 535-5532

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

## 19.2. <u>Requirements for Confirmation of the Plan.</u>

At the Confirmation Hearing, the Bankruptcy Court must confirm the Plan if it determines that all of the requirements of Section 1129 of the Bankruptcy Code have been satisfied. The applicable requirements are as follows:

(a)     The Plan complies with the applicable provisions of the Bankruptcy Code;

(b)     The Debtors have complied with the applicable provisions of the Bankruptcy Code;

(c)     The Plan has been proposed in good faith and not by any means forbidden by law;

(d)     Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Case, or in connection with the Plan and incident to the Case, has been approved by, or is subject to the approval of, the Court as reasonable;

(e)     The Debtors have or will disclose the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan; and the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Interests and with public policy; and the Debtors have disclosed the identity of any insider that will be employed or retained by the Liquidating Debtor, and the nature of any compensation for such insider;

(f)     With respect to each class of impaired Claims or Interests, either each holder of a Claim or Interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on

DAK-JLF
G:\DAK\Huron Drafts\ Plan (Joint)(8-20-08) DStmnt 1.doc

1    such date under Chapter 7 of the Bankruptcy Code;

2         (g)    Subject to the "cramdown" provision of the Bankruptcy Code discussed in

3    Section 19.4 below, each class of Claims or Interest has either accepted the Plan or is not impaired

4    under the Plan;

5         (h)    Except to the extent that the holder of a particular Claim has agreed to a

6    different treatment of such Claim, the Plan provides that Allowed Administrative Claims, Priority

7    Claims and Tax Claims will be paid in full on the Effective Date of the Plan;

8         (i)    If a class of Claims is impaired under the Plan, at least one class of impaired

9    Claims has accepted the Plan, determined without including any acceptance of the Plan by any

10   insider holding a Claim of such Class;

11        (j)    Confirmation of the Plan is not likely to be followed by the liquidation, or the

12   need for further financial reorganization, of the Debtors or any successor to the Debtors under the

13   Plan, unless such liquidation or reorganization is proposed in the Plan;

14        (k)    All fees payable under section 1930 of title 28, as determined by the Court at

15   the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all

16   such fees on the Effective Date of the Plan;

17        (l)    All transfers of property of the Plan are to be made in accordance with any

18   applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or

19   trust that is not a moneyed, business, or commercial corporation or trust.

20        **19.3.    Compliance with Confirmation Requirements.**

21        The Debtors believe that all of the foregoing requirements have been or will be met prior to

22   the Confirmation Hearing.  Specifically, they believe:  (1) the Plan is in the best interests of

23   Creditors, in that holders of all Allowed Claims will receive payments under the Plan having a

24   present value as of the Effective Date of the Plan in amounts not less than the amounts likely to be

25   received if the Debtors were liquidated in a case under Chapter 7 of the Bankruptcy Code; and (2)

26   the Plan will be accepted by sufficient votes in each impaired class or may be confirmed under the

27   cramdown standards of Section 1129(b) even if sufficient votes are not received.

28   ///

### 19.4. __Cramdown.__

In the event that any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan "does not discriminate unfairly" against a class if the plan allocates value to that class in a manner consistent with the treatment afforded to other classes with similar legal claims against the Debtors. "Fair and equitable" has different meanings for the holders of secured and unsecured claims, and for the holders of interests.

With respect to a secured claim, "fair and equitable" means either: (a) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of the plan at least equal to the value of such creditor's interest in the property securing its liens; (b) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds are treated in accordance with clauses (a) or (c) hereof; or (c) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either: (a) each impaired unsecured creditor receives or retains property of a value equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

With respect to a class of interests, "fair and equitable" means (a) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) the holder of any interest that is junior to the interest s of such class will not receive or retain any property under the plan on account of such junior interest.

In the event that one or more classes of impaired Claims rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not

DAK JLF
K:\BALESTO\Dsclosng Pln Ddsc\Amd(082208) DFsch.vpd 1.doc
58   AMENDED DEBTORS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN DATED AUGUST 22, 2008

Case: 08-50050   Doc#: 1823   Filed: 08/22/08   Entered: 08/22/08 14:26:47   Page 65 of 70

1 | discriminate unfairly against any rejecting impaired class of Claims.

2 | **ARTICLE XX.**

3 | **BEST INTERESTS TEST**

4 |     The Bankruptcy Court must independently determine that the Plan is in the best interest of all

5 | classes of Creditors and Interests. The "best interest" test requires that the Plan provide to each

6 | dissenting member of each impaired Class a recovery that has a present value at least equal to the

7 | present value of the distribution which each such Creditor or Interest Holder would receive if the

8 | Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

9 |     In performing this analysis, the Bankruptcy Court must determine the amount that would be

10 | generated from a Chapter 7 liquidation of the Debtors' assets after deducting the cost of liquidation.

11 | The cost of liquidation would include the Trustee's commissions, the Trustee's expenses, fees for

12 | counsel and other professionals retained by the Trustee and Administrative Claims. In addition to

13 | liquidating the Debtors' assets, the Trustee must also decide whether to litigate certain claims and

14 | possibly other litigation matters. In these cases, the Debtors have already reduced many of their

15 | assets to cash and have already absorbed the costs of operating or winding down their businesses to

16 | realize upon these and other assets. In a Chapter 7 case, a trustee would be entitled to seek a sliding

17 | scale commission based upon the funds distributed by such trustee to Creditors, even though the

18 | Debtors have already accumulated the funds and the Bankruptcy Estates have already incurred the

19 | expense associated with generating those funds. In addition, the Debtors and their professionals

20 | have spent significant time investigating potential reserved claims and legal rights, the validity of

21 | claims filed and scheduled, the value of the assets and their saleability. The Debtors operated in a

22 | highly regulatory arena and as such the Debtors have the expertise and have spent significant time

23 | researching and acquiring the requisite knowledge to operate in such a highly regulated area. A

24 | trustee would necessarily need to expend significant sums in gaining the expertise and understanding

25 | the Debtors and their professionals have already obtained. The cost already incurred in gaining such

26 | knowledge would necessarily need to be incurred again if a trustee were to be put in place.

27 |     In addition, the Debtors' businesses were multifaceted. DMG has been employed by the

28 | Debtors for over 9 months, affording DMG familiarity with the Debtors' business operations,

accounting systems and records. Importantly, the Debtors' prior employees have been engaged as consultants by the Debtors post-petition and are important because of their knowledge of the Debtors and their collective memory of events and issues that cannot easily be accessed by a trustee reading "cold" records. It should be noted that there is no assurance the consultants would remain available in a Chapter 7 liquidation. Critical former employees remain (or make themselves available) out of loyalty to the Debtors.

Moreover, generally no distribution is made in a Chapter 7 case until all assets of the bankruptcy estate and all claims have been liquidated, a process that can take many months and sometimes years. On the other hand, barring unforeseen Claims, Confirmation of the Plan will enable the Liquidating Debtor to timely distribute all liquidation proceeds which the Debtors believe will result in the highest and best recovery for Creditors. By proceeding to liquidate the remaining assets and distribute the Liquidating Debtor's cash proceeds in accordance with the Plan, the Debtors believe that the liquidation proceeds can be distributed sooner and at a lesser expense.

The net proceeds of the Liquidating Debtor's assets will be distributed in accordance with the priority scheme set forth in the Bankruptcy Code. Any assets not liquidated prior to confirmation of the Plan will be liquidated by the Liquidating Debtor, acting through the Responsible Person. The Debtors, therefore, believe that the liquidation under the Plan will achieve at least the same results (or better) as would occur in the conversion of the Case to Chapter 7. The result can be achieved without the duplication of administrative costs that would result from the appointment of a Chapter 7 Trustee and the employment of additional professional persons, and the delay attendant with the administration of the assets in Chapter 7. More importantly, should these cases be converted to Chapter 7, absent substantive consolidation, arguably two separate Chapter 7 Trustees should be appointed to administer the separate estates, resulting in substantial administrative expenses. Were a Chapter 7 Trustee to determine that substantive consolidation is appropriate, there are certain procedures that the Chapter 7 Trustee would have to follow in order to obtain the same results achieved by the Plan. At a minimum, a Chapter 7 Trustee would have to file and serve a motion upon all interested parties. Should the motion be contested, if, for example, one of the appointed trustees disagreed with the appropriateness of substantive consolidation, the Chapter 7 estates would

Case 2:06-50030    Doc#186    Filed 08/22/08    Entered 08/22/08    Page 67 of
70

1    bear the cost of litigating the motion and negotiating with parties before consolidation could be

2    affected.

3         Those Creditors who are impaired under the Plan, therefore, are receiving, at a minimum, the

4    equivalent of what they would receive if the liquidation was completed in a Chapter 7 case. The

5    Debtors believe that the Creditors will fare much better should the liquidation be achieved in

6    Chapter 11 under the Plan. **Exhibit "A"** attached hereto is a summary and an estimate of the

7    amounts that will potentially be available for Distribution under the Plan.

8                                    **ARTICLE XXI.**

9                                    **FEASIBILITY**

10        The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by

11   the liquidation or the need for further financial reorganization of the Debtors unless such liquidation

12   is contemplated by the Plan. The Plan contemplates the final liquidation and distribution of the

13   Debtor's assets, and the liquidation proceeds will be sufficient to complete the liquidation and

14   distribution process. **Exhibit "A"** hereto demonstrates that the Debtors have sufficient cash to fund

15   the estimated payments required on the Effective Date.

16                                   **ARTICLE XXII.**

17                          **POST-CONFIRMATION MANAGEMENT**

18        As detailed Article IX above, the Liquidating Debtor will be managed by the Responsible

19   Person. DMG will be nominated as Responsible Person.

20   DATED: AUGUST 22, 2008          **COMUNITY LENDING, INCORPORATED**
                                     A CALIFORNIA CORPORATION
21

22                                   BY:  */S/ RICHARD G. COUCH*
                                          CHIEF EXECUTIVE OFFICER AND
23                                        RESPONSIBLE PERSON

24

25   DATED: AUGUST 22, 2008          **LES LIQUIDATION, INC.**
                                     A CALIFORNIA CORPORATION
26

27                                   BY:  */S/ RICHARD G. COUCH*
                                          CHIEF EXECUTIVE OFFICER AND
28                                        RESPONSIBLE PERSON

**MURRAY & MURRAY**
A PROFESSIONAL CORPORATION

BY:      /s/ DORIS A. KAELIN
         DORIS A. KAELIN
         ATTORNEYS FOR DEBTOR

*DBA's of the Debtor: 1st Advantage Mortgage; 1st Premier Mortgage; 1st USA Mortgage and Investment; A Better Choice Mortgage; Accepted Mortgage Group; Access Mortgage LLC; Accredited First Financial Mortgage; Accurate Lending; Ace Mortgage; Achill Mortgage; Advantage Funding Group; Aladdin Mortgage; All Valley Mortgage of Clovis; Allied Mortgage; Alpha Mortgage Funding; American Fidelity Mortgage; American Mortgage and Financial Services; American Mortgage Resources; Amoskeag Mortgage; Atlantic Coast Financial Group; Atlantic Liberty Lending; Austinloan.com; Avalon Financial Group; Award Funding; Bay Area Lending; Best Rate Lending; Black Mountain Mortgage; Borrowers Best Mortgage Company; Borrowers Best Mortgage MAC; Borrowers Best Mortgage MAC 2; Buyers Advantage Home Lending; California Mortgage Alliance; Capital Lending House; Capitol Mortgage; Central Coast Mortgage; Citinet Lending; City Wide Mortgage; CityLine Financial; CJ Mortgage; Clear Sky Lending; Colorado Community Lending; Community Lending Group; Community Lending of Greater Chattanooga; Community Lending of Las Vegas; Community Mortgage Alliance; Community Mortgage Lending; Community Mortgage Planners; ComUnity Lending; Consultants West; Consumers Choice Mortgage; Coppertree Lending; Cornerstone Capital; Coronado Mortgage; Creative Mortgage Solutions; CreditFlex Funding; Cross Mortgage; Crystal Clear Mortgage; Definitive Financial; Desert Sound Financial Group; Direct Funder; Direct Home Lending; Dream Mortgage; Everquest Mortgage; F3 Lending Group; Fidelity Mutual Financial; Financialgroup Mortgage; First Assurance Mortgage; First Choice Financial Group; First Choice Funding; First Option Mortgage; First Rate Mortgage; Franklin Mortgage Group; G.I. Home Loans; Gemini Mortgage; Genesis Lending Group; Gold Star Mortgage; Good Life Financial; Heartland Mortgage Group; Hemet Mortgage; High Q Mortgage Solutions; Home Financial; Home Lending Team; Home Loan Café; Home Loan Online; HomeFindersCenter.com; Homefront Financial; House Mart; Ida's Direct Mortgage; Illinois Community Lending; Imani Mortgage; Infinity Capital Lending; InstaLoan Approval; J & L Lending; J&H Associates Mortgage Group; Jay Royal Mortgage Lending; JEI Mortgage Services; JMAC Lending; JMC Financial; Keystone Lending; Land America Mortgage; Latte Stone Mortgage; Lender for Life Mortgage; LFC Lending; Lighthouse Mortgage; Lion Funding Group; Loan Services; LoanAxis.net; LoanSmart Lending; Louisiana Community Lending; Maxxim Mortgage; Metro Home Loans; MGM Financial; Midwest Equity Financial Services; Midwest Lending Source; Millenium First Funding; Missouri Home Lenders; Mortgage Service of Tallahassee; Mortgage Funding Servicing; Mortgage Initiative; Mortgage Lending Solutions; Mortgage Lending Source; Mortgage MD; Mortgage Only; Mortgage Partners; Mortgage Providers; MortgageTown Direct; Mountain Point Mortgage; MTS Home Loans; National Mortgage; New England Alliance Mortgage; Noble Lending Group; Northeast Community Lending; Number 1 Mortgage; Ohio Community Lending; Olde Country Fair Mortgage; Omega Mortgage Group; On The Move Mortgage Services; Pacific Capital Mortgage; Pacific Lending Group; Paradigm Home Lending; Paradigm Home Mortgage; Paradise Financial Mortgage; Paramount Home Lending Network; Patriot Home Loans; Pennica Lending Group; Phoenix Capital Group; Pine Star Mortgage; Preferred Funding; Premier Capital Mortgage; Premier Direct Lending; Premier Lending Group; Premiere Lending Co; Prestige Funding Group; Prime Rate Mortgage; Primestar Lending; Priority One Lending; Provident Lending; Quality Mortgage Services; Residential Funding; Rockview Lending Group; SA Taft; San Jose Wholesale; Satisfaction Mortgage; Security National Lending; Select Mortgage Services; Signature Lending; Skyline Funding; Source Funding Group; Southern Community Mortgage; Southwest Capital Funding; Special Forces Mortgage; Speedy Lending Group; SRA Mortgage; Summit Community Lending; Superior Mortgage; Texas Residential Lending; Texline Mortgage; The Loan Arrangers; The Mortgage Center of Tucson; The Mortgage Channel; The Principle Lending; Three Rivers Mortgage; Titan Financial Group; TL Mortgage; Tri State Community Lending; UEX Financial; Union Lending; Unity Lending; Universal Financial Group; Universal Lending; Universal Lending of Elk Grove; Universal Valley Mortgage; Unlimited Mortgage Service; Urbana Mortgage; Valley Mortgage; Valley Wide Home Loans; Victoria Mortgage; Victory Lending; Virginia Community Lending; Wardley Mortgage; West Avenue Mortgage; West Coast Community Lending; Windsor Lending; Your Lowest Mortgage; Zenith Financial Services.

Case: 06-50000    Doc #: 186    Filed: 08/22/08    Entered: 08/22/08 14:08:42    Page 70 of 70