JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
JENNY L. FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: dkaelin@murraylaw.com
Email: jlfountain@murraylaw.com

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>COMUNITY LENDING, INCORPORATED, A CALIFORNIA CORPORATION, ET AL.*<br><br>Debtor.<br><br>7650 Marathon Drive, Suite A<br>Livermore, CA 94550<br><br>Employer's Tax ID No.: 94-2673933 | Case No. 08-50030-MM-11<br><br>Chapter 11<br><br>Jointly Administered Chapter 11 Cases |
| In re:<br><br>LES LIQUIDATION, INC., A CALIFORNIA CORPORATION, fka LENDER E-SOURCE INC.<br><br>Debtor.<br><br>7650 Marathon Drive, Suite A<br>Livermore, CA 94550<br><br>Employer's Tax ID No.: 33-0966517 | Case No. 08-50031-MM-11<br><br>Hearing Date:<br><br>*[To be scheduled]* |

///

///

///

### MOTION BY DEBTORS TO CONVERT TO CHAPTER 7 FOLLOWING A HEARING[1]
### (11 U.S.C. § 1112(a))

TO: THE HONORABLE MARILYN MORGAN, UNITED STATES BANKRUPTCY JUDGE:

ComUnity Lending, Inc. ("CLI") and LES Liquidation, Inc. ("LES" and collectively with CLI, the "Debtors"), the debtors and debtors in possession herein, hereby move this Court for an order pursuant to 11 U.S.C. § 1112(a) converting these Chapter 11 cases to a case under Chapter 7 of Title 11 of the United States Code. While Chapter 11 was required while CLI's business was operating, the operational tasks have been substantially completed. The Debtors have successfully completed the liquidation of substantially all of CLI's loans and real estate owned properties ("REOs"), along with other assets. The other remaining assets are of a contingent nature, require litigation, or not readily subject to liquidation. The continuing decline of the real estate market and the current national/regional financial crisis has adversely impacted the value of the Debtors' remaining assets. As a result, the Debtors no longer believe that a liquidating plan can assure creditors more than they would receive in a Chapter 7 case. Accordingly, the Debtors believe that conversion of these cases to Chapter 7 is appropriate.

Rather than seeking immediate conversion as permitted by Section 1112(a), the Debtors are setting this matter for hearing so that certain transition matters can be addressed in the interim. These include the completion of the appraisal of the Madrone development project which is already underway. The appraisal will aid the trustee in marketing the Debtors' interest. However, payment of the appraiser's $8,000 fee to prepare the report will be required to obtain the report. The Debtors will also assist special counsel employed to obtain out-of-state subpoenas of records in the Top Hat litigation to submit short form compensation requests. The Debtors will request authority to pay the appraiser and certain professionals prior to conversion of the case. The Debtors are also in the process of compiling additional information requested by Judge Ware pertaining to the Top Hat litigation. Additionally, an involuntary petition has been filed against Innergy Lending, LLC ("Innergy"), a limited liability company in which CLI holds a 50% member interest. As a member

---

[1] The Debtors intend to seek a special setting of the hearing on this motion for November 20, 2008 or such other date as may be approved by the Court.

and creditor of Innergy, CLI's participation in the entry of an order for relief is contemplated. CLI intends to file a joinder in the Innergy involuntary petition. Accordingly, the Debtors will seek a special setting of a hearing on this motion as well as the compensation requests of the above-described professionals.

## I. THE CHAPTER 11 FILING AND OVERVIEW

1. The within cases were commenced on January 4, 2008 (the "Petition Date").

2. No creditors' committee has been appointed in either case.

3. Prior to the commencement of its case, CLI was historically in the business of originating, brokering, servicing and selling residential mortgages. As of the Petition Date, CLI was no longer originating loans. However, CLI continued to operate in the Chapter 11 case with respect to other aspects of the business. Among other benefits, continuing to operate allowed CLI's loans and REO properties to be liquidated expeditiously and at optimal pricing for the market. Some of the loans were in various stages of foreclosure and required the continuity of former CLI employees assisting in the case to undertake the steps required to complete such foreclosures to transition non-performing loans into assets with real liquidation value (i.e., an REO). CLI was also servicing loans on the Petition Date as part of its ordinary course operations. "Servicing" of loans requires the collection and enforcement of residential mortgage loans. The services involved may include, without limitation, billing and processing principal and interest payments received from borrowers and remitting the payments to the appropriate entities; processing tax and insurance payments received from borrowers and paying out the corresponding obligations owed to taxing authorities and insurers; maintenance of loans; collection efforts; disposition of delinquent loans; foreclosure activities and disposition of collateral acquired through foreclosures or other legal process; and performance of investor accounting and reporting processes. Continued servicing of loans was necessary to avoid borrower defaults and other repercussions if the borrower loans were not administered properly. Loans not properly serviced could have resulted in additional repurchase demands against the estate if borrower escrow amounts were not timely remitted. Finally, CLI's continued servicing of the loans reduced the administrative expense of maintaining a third-party loan servicer for the remaining loans owned by CLI while CLI marketed the properties for sale.

4.     As part of the loan servicing activity, CLI conducted a reconciliation of approximately 16,000 loans. A pool of approximately 3,000 loans had positive or negative amounts owing or due. CLI determined that certain funds represented borrower funds for impound type liabilities (property taxes, insurance and the like) and such funds were paid over to the appropriate payee following a court order. The reconciliation also served to identify funds owing to CLI by borrowers and investors, resulting in demands to such persons. Claims against GMAC for errors in loans it serviced for CLI were also identified, providing the groundwork for the trustee to pursue legal claims against GMAC.

5.     CLI was in a highly regulated market and did business in 44 states. With advisement of regulatory counsel, CLI continued the license surrender process that had commenced pre-petition in order to avoid the incurrence of business and regulatory fees, penalties and other potential claims by the state agencies. CLI has surrendered its mortgage licenses in 44 states and the related Secretary of State/Foreign Corporation closures have been completed. Following the Petition Date, CLI also responded to investigations and complaints by HUD. These efforts effectively cleared such claims and eliminated the need for future responses. There are many other regulatory matters that required attention during the Chapter 11 case. These have been substantially completed so the trustee's efforts can be primarily focused on liquidation matters. Additional discussion of efforts required in the CLI case and the results achieved is provided below.

6.     LES is the wholly-owned subsidiary of CLI which was not operating as of the Petition Date.

7.     During the pendency of the Chapter 11 case, the Debtors have been managed by Diablo Management Group ("DMG") and Richard G. Couch, the Court-appointed Responsible Person in these cases. Certain former employees of CLI have also provided services as independent contractors. The Debtors have employed Murray & Murray as bankruptcy counsel in these cases. The Debtors have also employed special counsel for certain matters, as well as an accounting firm for tax preparation purposes.

///

///

8. The Debtors are current on their monthly operating reports and quarterly fees to the Office of the United States Trustee. To the best of their knowledge, the Debtors are also current on all post-petition taxes.

## II. REPORT ON OTHER SIGNIFICANT MATTERS IN THE CHAPTER 11 BANKRUPTCY CASE[2]

9. <u>Liquidation Recoveries</u>. Most of CLI's loans and REO properties that existed on the Petition Date have been liquidated. In total, all assets liquidated in the Chapter 11 case to-date have resulted in receipts by the Debtors of $2,257,351 as reported on the Monthly Operating Reports filed for the month ending September 30, 2008. As of September 30, 2008, the unrestricted cash on hand of the Debtors totals $2,000,646. These funds are held in an authorized debtor-in-possession bank account. The Debtors also hold over $5 million in restricted accounts, which funds primarily pertain to the pending Top Hat litigation discussed below.

10. <u>Assets Requiring Liquidation</u>.

a. <u>Remaining Loans/REO properties</u>. The bulk of CLI's loans have been sold. CLI is in the process of refinancing a second deed of trust which if successful will result in the recovery of approximately $100,000 to CLI. The remaining loan inventory is either seriously delinquent or no payment is due. CLI has only one REO property remaining located in Michigan which is listed for sale at $65,000.

b. <u>Madrone</u>. CLI has a 46% interest in a real estate development project in Morgan Hill. The scheduled book value of the interest is $1,949,305.17. DMG has spoken to several interested parties about the sale of CLI's interest in Madrone. Subject to Court approval, CLI has engaged an appraiser to establish the current market value of the development. DMG has also located a broker to market CLI's interest in the development. However, the decision to engage the broker will be deferred to the trustee. The Debtors will be submitting an application to employ the appraiser, as well as a motion to approve payment of the appraisal fee of $8,000. The appraisal report will provide the trustee with a baseline for the value of the real property in order to evaluate potential bids on CLI's interest in the development.

---

[2] The following is for informational purposes only and is not intended to replace the reports required by the Debtors upon conversion of the case as required by Federal Rule of Bankruptcy Procedure 1019.

c. <u>Terwin</u>. As previously noted in other filings, CLI has a subordinated interest in an asset-backed security collateralized by residential real estate mortgages known as the "Terwin Micro Asset-Backed Securities, Series 2007-Community1" (the "<u>Security</u>") The book value of the interest as listed in CLI's Schedule B is $4,996,278, but the Debtor's ongoing analysis of the monthly loan servicing reports from the Security indicates that the underlying loan value of CLI's subordinated interest is worth approximately $2.5 million after a June distribution from the Security. CLI has engaged in discussions with an investor who is interested in purchasing the entire security. As discussed in other pleadings filed with the Court, the loan servicer purported to repurchase all remaining loans at a price which would have wiped out CLI's interest without any compensation. A notice of violation of the automatic stay was sent and the repurchase notice was withdrawn. The Debtors believe legal claims may exist against various parties involved in the transaction. Among such claims stems from CLI's belief that the underlying Trust Agreement was materially modified after CLI executed the agreement, without CLI's knowledge or consent, materially impacting CLI's interest in the Security.

d. <u>Innergy</u>. CLI owns a 50% interest in Innergy along with World Financial Group, Inc. ("<u>WFG</u>") who owns the other 50%. Innergy was also in the business of brokering loans and faced declining revenues based on market conditions. An involuntary petition has been filed against Innergy in San Jose as an affiliate of CLI. Innergy's records reflect that WFG received a payment of $1.2 million from Innergy, without CLI's consent, in October 2007. It is anticipated that upon entry of the order for relief in the Innergy case, that the Innergy Chapter 7 trustee will seek recovery of the preferential payment from WFG. CLI holds a claim against Innergy (in addition to an equity interest) of approximately $2 million. Accordingly, recovery of the preferential payment from WFG could result in a sizeable payment to CLI on account of its claim against Innergy. CLI intends to join the Innergy involuntary petition pursuant section 303(c) of the Bankruptcy Code.

e. <u>Top Hat Litigation</u>. The litigation with the participants in the "Top Hat Plan" continues. In early October, the plaintiffs and CLI participated in mediation through BDRP. The parties were too far apart and therefore no settlement resulted. The parties argued their cross motions for summary judgment on October 6, 2008. Judge Ware has indicated he will issue an order

DAK
K:\Community Lending\Pld\Mot-Convert\Mot v3.doc

6

MOTION BY DEBTORS TO CONVERT TO CHAPTER 7 FOLLOWING A HEARING

Case: 08-50030    Doc# 231    Filed: 10/24/08    Entered: 10/24/08 17:32:27    Page 6 of 10

requiring further submissions in connection with the pending motions for summary judgment. If the matter is not resolved by summary judgment, trial is not anticipated to occur earlier than Spring 2009. The amount at stake exceeds $5 million: if the estate is successful, the funds in the plan will be available to pay claims of the estate; if the Plaintiffs are successful, they will be entitled to the funds. CLI is in the process of compiling the information that Judge Ware indicated would be the subject of his order at the hearing on the motions for summary judgment. In addition, one of the out-of-state attorneys will be preparing and issuing a subpoena for documents related to the litigation. CLI will also be propounding discovery requests upon the Plaintiffs.

   f. <u>E&O Claim</u>. Following investigation, CLI submitted a claim against its insurer to recover losses of between $750,000 and $1.5 million resulting from employee-related fraud in $9 million worth of mortgage transactions.

   g. <u>Other Claims</u>. In the process of preparing its liquidating plan (discussed below), the Debtors have identified numerous potential claims against third parties. Demands have been sent on a number of the claims which have resulted in some recoveries to the estate to-date. However, adversary proceedings will be required for many of the claims. Among these claims include claims against the purchaser of the assets of LES prior to the Petition Date for which LES received no consideration.

   h. <u>Loan Fraud Recovery</u>. The Debtors investigated their ability to recover against third parties for loan fraud. Based on discussions with one forensic audit team, potential recoveries were estimated at between $1 million and $3 million. However, significant review (and therefore expense) is required by the forensic auditor to determine if a claim for fraud exists, plus legal fees to pursue such claims. The continuing decline in market conditions poses issues of collectability on any judgment. DMG has investigated the possibility of selling any such fraud claims to a third party. Certain persons who have historically purchased such claims are not purchasing these claims in the current market. Thus, the value to be realized from such claims is speculative at this juncture.

   i. <u>Other</u>. CLI also has interests in intellectual property that will require further marketing by the trustee.

11. **Claim Reduction.** As discussed above, continued business operations (including loan servicing) and addressing regulatory matters eliminated potential claims that could have otherwise resulted against the estate. Early in the case, the Debtors filed motions to reject twenty-five real property leases and various equipment leases (which were granted) thereby reducing potential administrative claims against the estate. Overhead for ongoing business operations was reduced by relocating to DMG's warehouse which also provided much needed storage space for business records requiring more regular access than would be cost effective with a storage facility. CLI has also commenced analysis of certain significant priority claims that will aid the trustee in filing objections upon his or her appointment.

12. **401(k) Plan Closure.** As of the Petition Date, over $2.5 million in funds belonging to over 370 participants were held in CLI's 401(k) Plan maintained at Transamerica. CLI has been processing rollovers (over 100 since the Petition Date) and efforts are underway to formally terminate the Plan.

13. **Tax Matters.** The Debtors' 2007 income tax returns were prepared and filed. Tax reporting obligations have also been addressed including the preparation of 275 Form 1098s sent in the first quarter of this year as required by law to report interest paid by borrowers in 2007.

14. **Filing of Plan.** The Debtors filed a proposed plan of liquidation on July 7, 2008 and an amended plan was filed on August 22, 2008. The Debtors' liquidation analysis projected a distribution to general unsecured creditors of between 10 and 15% with the variance attributable to the outcome of the Top Hat litigation. Based on the continuing decline of the economy and the nature of the remaining assets, the Debtors now estimate the return to unsecured creditors will be significantly less. The remaining assets are of a contingent nature or require litigation to pursue. The benefit of proceeding in Chapter 11 has been realized and the Debtors have concluded the cases are at a point that a trustee can liquidate the remaining assets without the attendant expense of operating the business.

15. The process of preparing the plan required the Debtors to identify possible claims against third parties in order to properly reserve such claims in the plan. Based on the volume and amount of business by CLI during applicable reach-back periods for avoidance actions and other

claims, identifying potential claims required significant effort. These efforts should be of direct benefit to the trustee appointed in the case in pursuing recovery actions.

### III. MEMORANANDUM OF POINTS AND AUTHORITIES

16. Section 1112(a) authorizes a debtor to convert a case under Chapter 11 to a case under Chapter 7 as a matter of right, unless the debtor is not a debtor in possession, the case started as an involuntary case, or the case was converted to Chapter 11 upon the prior request of another party. 11 U.S.C. § 1112(a). The within Chapter 11 cases were commenced voluntarily, the debtors are debtors in possession and the cases were not previously converted to Chapter 11. Accordingly, conversion of the Chapter 11 cases upon this motion is authorized by Section 1112(a).

17. As discussed above, the matters that required the cases to be in Chapter 11 have been completed. The Debtors' estimates for creditor recoveries have been adversely impacted by the market. Accordingly, the Debtors believe that it is appropriate to bring a trustee in at this juncture to liquidate the remaining assets.

18. While a hearing is not required on this motion, the Debtors intend to schedule this motion for a hearing to coincide with other pending requests. As referred to above, an appraisal is underway for the Madrone development project. The appraiser has visited the property and has commenced gathering information to complete an appraisal. The cost of the appraisal is a flat fee of $8,000. The Debtors will seek to employ and pay the appraiser before conversion so the trustee has the benefit of the report upon appointment. The Debtors have also employed special counsel to subpoena records out-of-state in the Top Hat matter and is in the process of filing an employment application for one additional out-of-state attorney for the same purpose. Their fees are not anticipated to exceed in total $15,000 and therefore the Debtors will seek authority to pay such persons prior to conversion of the case. The Debtors' accountants and special regulatory counsel may also wish to have their applications heard before these cases are converted. CLI's MOR for the month ending September 30, 2008 reflects that its accountant (Rothstein) is owed $33,681.51 or a net amount of $13,6831.51 upon application of its $20,000 retainer; and special regulatory counsel (Buchalter Nemer) is owed $29,425.50. Pending conversion of the case, the Debtors also intend to proceed with the matters discussed above regarding the Top Hat litigation and the Innergy matter.

Case 08-50030   Doc# 231   Filed: 10/24/08   Entered: 10/24/08 17:32:27   Page 9 of 10
K:\Community Lending\Pld\Mot-Convert\Mot v3.doc                    9             MOTION BY DEBTORS TO CONVERT
                                                                                  TO CHAPTER 7 FOLLOWING A HEARING

Holding a hearing on this motion will allow the Debtors to report on the above matters before the order converting the case is actually entered.

### IV. CONCLUSION

**WHEREFORE**, the Debtors respectfully request that following a hearing, the Court enter an order converting the within Chapter 11 cases to a case under Chapter 7.

Dated: October 24, 2008          **MURRAY & MURRAY**
                                 A Professional Corporation

                                 By: */s/ Doris A. Kaelin*
                                     Doris A. Kaelin
                                     Attorneys for Debtors